1
2
3
4
5
6
7
8                        **UNITED STATES DISTRICT COURT**

9                        **EASTERN DISTRICT OF CALIFORNIA**

10

11   UNITED STATES OF AMERICA,            Case No.: 1:22-cr-00233 JLT SKO

12              Plaintiff,                ORDER ON MOTIONS IN LIMINE

13        v.                             (Sealed Docs. 102, 141; Docs. 132, 133, 135)

14   SHANA GAVIOLA and JULIO
     SANDOVAL,
15

16              Defendants.

17

18        The indictment in this case charges Shana Gaviola and Julio Sandoval with interstate

19   violation of a protection order, and aiding and abetting the same, in violation of 18 U.S.C.

20   §§ 2262(a)(2) and 2. (Doc. 1.) The parties have submitted numerous motions in limine for

21   resolution before trial. (Sealed Docs. 102, 141; Docs. 132, 133, 135.) The Court held a hearing on

22   the motions on September 22, 2025. For the reasons discussed on the record and set forth below,

23   the Court orders as follows.

24   **I.      Background**

25        Gaviola is MV's mother. In July 2021, while 16 years old, MV petitioned the Fresno

26   County Superior Court for a temporary restraining order prohibiting Gaviola from, among other

27   things, contacting MV. (Doc. 144-2.) The court issued the order on July 14, 2021. (Doc. 135-1.)

28   Though MV and Gaviola both resided in Fresno County, California at the time the restraining

                                        1

order was issued, they did not reside together. (Indictment, Doc. 1 at 1-2.) Along with the petition for a restraining order, MV also filed a petition to become an emancipated minor. (*Id*. at 2.)

On July 15, 2021, an officer of the Clovis Police Department spoke with Gaviola by telephone and explained the terms of the restraining order against her. (Doc. 135-2.) The officer then emailed Gaviola a copy of the order and reviewed it with her again over the telephone. (*Id*.) On August 18, 2021, Ms. Gaviola appeared in court at the hearing on MV's petition for emancipation. (Doc. 150-2 at 3) The Court granted Ms. Gaviola's request to continue the hearing to allow her to retain counsel. *Id*. At the hearing, the bailiff served Gaviola a copy of the restraining order and a copy of the emancipation petition. *Id*.

Thereafter, the government alleges that Gaviola arranged with Sandoval to have MV transferred to a religious boarding school in Stockton, Missouri, where Sandoval was the Dean of Students. (Doc. 1 at 2.) Sandoval was also the head of a company that transported minors to various boarding schools across the country. (*Id*.) The government alleges also that Gaviola and Sandoval agreed to send two agents of the transportation company to take physical custody of MV and transport MV from California to Missouri. (*Id*.)

The government alleges that on August 21, 2021[1], at the behest of the defendants, the two agents went to MV's workplace. (Doc. 1 at 3.) They restrained MV, directed MV to enter their vehicle, seized MV's iPhone 8, and drove MV for approximately 27 consecutive hours to the boarding school in Missouri. (*Id*.) MV remained restrained for the duration of the drive. (*Id*.) During the drive, law enforcement officers contacted Sandoval by phone and advised him that MV had an active restraining order against Gaviola. (*Id*.) Notwithstanding, Defendants continued to cause and direct the agents to transport MV to Missouri. (*Id*.) Upon arrival in Missouri on August 22, 2021, the agents delivered MV to the boarding school. (*Id*.) At the command, direction, and control of Sandoval, school staff members detained MV within the facility despite requests by MV's father to release MV into his custody. (*Id*.) After approximately eight days of detention, MV was released to the father's custody. (*Id*.)

///

[1] The indictment alleges that the event occurred on August 21, 2022, but this appears to be a scrivener's error.

1  **II.    Legal Standards**

2      **A.    Motions in Limine Generally**

3      "A motion in limine is a procedural mechanism to limit in advance testimony or evidence

4  in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (citation

5  omitted). "Although the Federal Rules of Evidence do not explicitly authorize in limine rulings,

6  the practice has developed pursuant to the district court's inherent authority to manage the course

7  of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citations omitted).

8      The Ninth Circuit explained that motions in limine "allow parties to resolve evidentiary

9  disputes ahead of trial, without first having to present potentially prejudicial evidence in front of a

10  jury." *Brodit v. Cabra*, 350 F.3d 985, 1004-05 (9th Cir. 2003) (citations omitted). However, "a

11  motion in limine should not be used to resolve factual disputes or weigh evidence," *C & E*

12  *Services, Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008), as that is the province of

13  the jury. *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150 (2000). The Court will

14  bar use of the evidence in question only if the moving party establishes that the evidence clearly

15  is not admissible for any valid purpose. *Jonasson v. Lutheran Child & Family Services*, 115 F.3d

16  436, 440 (7th Cir. 1997).

17      Moreover, the rulings on the motions in limine do not preclude either party from arguing

18  the admissibility of the evidence discussed herein, if the evidence adduced at trial demonstrates a

19  change of circumstances that would make the evidence admissible. In this event, the proponent of

20  the evidence **SHALL** raise the issue with the Court outside the presence of the jury.

21      **B.    Federal Rules of Evidence 401-403**

22      Evidence must be relevant to be admissible at trial. Fed. R. Evid. 402. Evidence is

23  relevant if "(a) it has any tendency to make a fact more or less probable than it would be without

24  the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

25  Even relevant evidence may be excluded "if its probative value is substantially outweighed by a

26  danger of one or more of the following: unfair prejudice, confusing the issues, misleading the

27  jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid.

28  403.

1    In evaluating these Rule 403 considerations, district courts enjoy "wide latitude" to admit

2    evidence. *Hemmings v. Tidyman's Inc*., 285 F.3d 1174, 1184 (9th Cir. 2002). A court may not use

3    Rule 403 to exclude evidence "on the ground that it does not find the evidence to be credible."

4    *See United States v. Evans*, 728 F.3d 953, 963 (9th Cir. 2013) ("Weighing probative value against

5    unfair prejudice under Rule 403 means probative value with respect to a material fact if the

6    evidence is believed, not the degree the court finds it believable."). That is, "a conflict in the

7    evidence goes to the weight of [the evidence], not to its admissibility." *United States v. Candoli*,

8    870 F.2d 496, 509 (9th Cir. 1989).

9    **C.    Federal Rule of Evidence 404**

10    Rule 404 prohibits using character or propensity evidence to prove conduct.

11    "Evidence of a person's character or character trait is not admissible to prove that on a particular

12    occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1).

13    Similarly, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's

14    character in order to show that on a particular occasion the person acted in accordance with the

15    character." Fed. R. Evid. 404(b)(1). However, "other acts" evidence may be used for the limited

16    purposes of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence

17    of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

18    **III.    Analysis**

19    **A.    Defendants' Motions in Limine**

20    Together, Defendants seek to narrow the case to only the evidence directly bearing on

21    whether they violated 18 U.S.C. § 2262(a)(2). (Docs. 115, 132, 133.)[2] They ask the Court to

22    exclude irrelevant post-offense events, improper or prejudicial references, prior bad acts, and in

23    Sandoval's case, Gaviola's statements. Both emphasize that admitting such evidence would risk

24    confusing the issues, inflaming the jury, and depriving them of a fair trial. Because Gaviola has

25    joined in all of Sandoval's motions, the Court addresses the defense motions in limine

26    collectively.

27    ---

28    [2] Sandoval initially filed his motions in limine on July 7, 2025. (Doc. 115.) He re-filed the same motions after Gaviola's counsel was substituted and a second amended pretrial order issued. (*See* Docs. 124, 128, 133.) Therefore, the Clerk of the Court is directed to terminate Doc. 115 as moot.

1          1.       Post-Offense Evidence

2          Defendants argue that much of the evidence the government may present is irrelevant to

3    the charged offense under 18 U.S.C. § 2262(a)(2), which requires a person to cause another

4    person to travel interstate by force, coercion, duress or fraud, and in so doing, engage in conduct

5    that violates a protection order. (Docs. 115, 132, 133.) They submit that the offense was complete

6    once the interstate travel was complete, and therefore, argue that any "post-transport" evidence or

7    argument is irrelevant and prejudicial under Federal Rules of Evidence 401-403.

8          The government argues that evidence of events that transpired between MV's arrival at

9    the boarding school and MV's release on August 29, 2021, is relevant because MV continued to

10   be held during that time, and thus, the temporary restraining order (TRO) continued to be

11   violated. (Doc. 150 at 9.) Section 2262(a)(2) of Title 18 of the United States Code provides, in

12   relevant part:

13              A person who causes another person to travel in interstate . . .
                commerce . . . by force, coercion, duress, or fraud, and in the course
14              of, as a result of, or to facilitate such conduct or travel engages in
                conduct that violates the portion of a protection order that prohibits
15              or provides protection against violence, threats, or harassment
                against, contact or communication with, or physical proximity to,
16              another person … shall be punished as provided in subsection (b).

17         The government interprets this language to mean that "[t]he offense conduct is not

18   complete at the interstate travel if, 'as a result of' the interstate travel, the defendant then proceeds

19   to violate or continue to violate the protection order." (Doc. 150 at 9.) Therefore, the government

20   asserts that the conduct proscribed by § 2262(a)(2) includes (1) the interstate transportation *and*

21   (2) the violation of a protection order, both of which must occur for the offense to be complete.

22   (*See id*. at 9 n.1.)

23         Defendants argue that the violation of § 2262(a)(2) is not a "continuing offense" and that

24   evidence of the events after the interstate travel only "relates to the impact that the offense had on

25   him." (Doc. 133 at 15.) The defendants disagree as to when such an offense is complete. Gaviola

26   argues that the offense was complete once MV was transported out of California. (Doc. 132 at 3.)

27   Sandoval submits that the offense was complete upon arrival in Missouri, after all travel was

28   completed. (Doc. 133 at 14.) Essentially, Defendants assert that any violation of a protection

                                             5

order would have to occur during the interstate travel, or that the violation must be the interstate travel itself. Despite this disagreement, the plain language of the statute, as pointed out by the government, is not limited to conduct that violates a protective order, which occurs during the travel. Likewise, the indictment does not limit itself to such conduct. (*See* Doc. 1 at 3.) If the Court were to accept Defendants' reading of the statute, this would render as surplusage the language "as a result of, or to facilitate such conduct or travel . . ." Courts have considered this language used in the instant statute and in 18 U.S.C. § 2261[3], which has much of the same language contained in § 2262.[4]

In *United States v. Page*, 167 F.3d 325 (6th Cir. 1999) (en banc), the defendant was convicted of interstate domestic violence, which, at the time, made it illegal for a person to "cause[ ] a spouse or intimate partner to cross a State line . . . by force, coercion, duress, or fraud and, in the course or as a result of that conduct, intentionally commit[ ] a crime of violence and thereby cause[ ] bodily injury to the person's spouse or intimate partner." 18 U.S.C. § 2261(a)(2) (1996) (prior to 2000 amendment). The court considered the question as to whether the "crime of violence" must occur during the travel under § 2261 and found that violence inflicted *before* the travel began was encompassed by the statute: "To assume that Congress intended to criminalize only those beatings occurring precisely during travel but not those occurring inside a home that are integrally related to forcible interstate travel would be to suggest that Congress somehow missed the boat." *Page,* 167 F.3d at 329 (Moore, K., concurring).

---

[3] The Sixth Circuit provided context for these statutes, explaining:

> As a response to the "escalating problem of violence against women" and in recognition of the severe toll such crimes have on our society in terms of "health care, criminal justice, and other social costs," Congress enacted in 1994 the Violence Against Women Act ("VAWA" or the "Act"). s.Rep. No. 103–138, at 37, 41 (1993) (proposed VAWA of 1993); *see* Pub.L. No. 103–322, 108 Stat. 1796, 1902–55 (1994). Among numerous other provisions, the Act criminalized interstate domestic violence and interstate violation of protection orders. *See* VAWA § 40221(a), 108 Stat. at 1926–31, 18 U.S.C. §§ 2261, 2262. While Congress was particularly concerned with those crimes that "disproportionately burden women," s.Rep. No. 103–138, at 37, the criminal provisions are gender-neutral, and enforcement has been gender-neutral as well.

*United States v. Page*, 167 F.3d 325, 326 (6th Cir. 1999).

[4] The two statutes contain limited material differences. In § 2262(a)(2), the defendant must violate a protective order, and in § 2261(a)(2), the defendant must commit an act of violence or attempt to do so. *See United States v. Page*, 167 F.3d 325, 329 (6th Cir. 1999) ("Sections 2261 and 2262 are parallel, prohibiting interstate domestic violence and interstate violation of a protection order, respectively.").

More to the point, in *United States v. Helem*, 186 F.3d 449, 455 (4th Cir. 1999)—another case questioning whether the conduct occurring before the travel is encompassed by §§ 2261 and 2262—noted that, "The drafting history also shows that the statute, as originally proposed in 1990, stated that the 'act that injures' must occur 'during the course of any such travel **or thereafter** . . .'" (quoting S.Rep. No. 101–545 at 53 (1990)) (emphasis added). The court concluded that the change in the draft language to address conduct that occurs "in the course or as a result of that conduct," was to expand prohibited conduct that occurs before, during, or after the travel. *Helem* at 454-55.

Informed by the decisions discussed above, the Court agrees with the government that "conduct that violates … a protection order" can occur "in the course of, as a result of, or to facilitate" the caused interstate travel; "in other words, before, during, or after the interstate transportation." (Doc. 150 at 10.) The jury must decide whether a protective order was violated. If it decides that one was violated, it may then find that it occurred before travel began, while travel was ongoing, or during MV's forced detention in Missouri. Any of these scenarios is supported by law. Thus, the government may offer evidence of events occurring during this timeframe insofar as the evidence is offered to prove that MV's continued restraint was a violation of the TRO, subject to Rule 403 balancing.[5, 6] For instance, the government states that it intends to offer evidence demonstrating Defendants' motive and knowledge of the offense based on events that occurred during MV's time at the boarding school. Such evidence is relevant for the permitted uses set forth in Rule 404(b)(2), subject to a limiting instruction. Accordingly, Defendants' motion is **DENIED**.

///

---

[5] Sandoval argues that the post-travel evidence is irrelevant because once MV arrived at the school in Missouri, Sandoval "was not directing or in charge of the decisions that were made with respect to MV's continued presence at the school." (Doc. 133 at 17.) The government, on the other hand, states that it intends to prove at trial that Sandoval continued to engage in conduct that violated MV's restraining order during MV's time at the boarding school. (Doc. 150 at 10.) Thus, this dispute raises question of fact for the jury to decide.

[6] Alternatively, Defendants argue that the TRO expired on August 23, 2021, and although the Fresno County Superior Court issued a subsequent order extending the initial order, § 2262(a)(2) only pertains to the violation of a single order, and thus, the second order somehow does not apply. (Doc. 133 at 18 ["the statute requires that [Sandoval] 'engage in conduct that violates the portion of *a* protection order.'" (quoting 18 U.S.C. § 2262(a)(2)) (emphasis in original)].) However, as the government notes, there was only one protection order; the "previously granted" TRO was extended to October 4, 2021. (Doc. 150 at 10 n.2, quoting Doc. 135-4 at 1.)

7

1          2.       Service of the TRO

2          Defendants also seek to exclude evidence related to the service of the TRO on July 15,

3    2021, arguing that the officer's method of reading the terms of the TRO and emailing a copy to

4    Gaviola was not proper legal service, and thus, the evidence is irrelevant because it "does not help

5    the jury determine whether either defendant violated 18 U.S.C. § 2262(a)(2)." (Doc. 133 at 24.)

6    There is no contention service had not been perfected.[7]

7          The government clarifies that it does not seek to introduce this evidence to demonstrate

8    proof of service. Indeed, it emphasizes that criminal liability under 18 U.S.C. § 2262 is not

9    predicated on whether service was perfected under California law. Rather, the government

10   contends that evidence of this encounter is relevant to prove that Gaviola was on notice of the

11   TRO and its terms as early as July 15, 2021, and that she was aware of the TRO hearing set for

12   August 23, 2021. (Doc. 150 at 17.) In other words, the government intends to offer this evidence

13   to establish Gaviola's knowledge and criminal intent. (*Id.*) The government also intends to argue

14   that one of Gaviola's motives for having MV forcibly transported to Missouri was to "defeat" the

15   TRO by making MV unavailable for the August 23 hearing, and thus, that the July 15 encounter

16   is relevant because it became a "catalyst" for Gaviola's hiring of Sandoval to facilitate MV's

17   transport, which occurred between August 21 and August 22. (*Id.*)

18         Finally, Gaviola asserts that admitting this evidence would risk misleading the jury about

19   the TRO's validity, which is an element of the offense. (Doc. 132 at 3-4.) To the contrary, the

20   statute does not mention "validity" as an element of the offense but, in any event, a certified copy

21   of the order demonstrates its validity. *See United States v. James*, 162 F. Supp. 3d 1201, 1204

22   (M.D. Ala. 2016). Therefore, the evidence the government intends to admit is relevant to establish

23   Defendants' notice, knowledge, intent, and/or motive to violate the TRO, subject to a limiting

24   instruction. *See* Fed. R. Evid. 404(b)(2). Defendants' motion is **DENIED**.

25          3.       Inflammatory Terms

26         Defendants request an order precluding the government from using inflammatory terms,

27

28   ───────────
     [7] The Court is unaware whether Gaviola contends that she lacked actual notice of the fact of the issuance of the
     protective order, its contents, or its effect.

                                                        8

1  such as referring to MV's transport as a "kidnapping" or "abduction." (Doc. 133 at 18-20.)

2  Gaviola also seeks to preclude the government from referring to MV as a "victim." (Doc. 132 at

3  4.) The government argues that it is premature for the Court to preclude the government from

4  using these terms. (Doc. 150 at 19-20.)

5                              *a.      "Kidnapping" and "abduction"*

6          First, the Court agrees that references to "kidnapping" and "abduction" would be improper

7  in this case. These are terms of law referring to criminal acts that Defendants are not charged with

8  committing and which they dispute occurred. The risk of misleading the jury, confusing the

9  issues, and unfairly prejudicing Defendants substantially outweighs any probative value or

10 convenience to the government; such terms are not "the natural language" used to describe the

11 forced interstate travel at issue here. Fed. R. Evid. 403. Therefore, the government will not be

12 permitted to use the terms "kidnapping" or "abduction," as this would imply that Defendants

13 committed additional crimes that are not charged in the indictment and for which the government

14 will not offer proof at trial. Accordingly, Defendants' motion is **GRANTED** as to these terms.

15                              *b.      "Victim"*

16         The Court agrees that use of the term "victim" is argumentative, presupposes a crime, and

17 carries a risk of prejudice. In *United States v. Sena*, 2021 WL 4129247, at *1 (D.N.M. Sept. 9,

18 2021), the defendant argued that "using the term 'victim' would violate Rule 403, invade the

19 province of the jury to decide whether there is, in fact, a victim, presuppose facts not in evidence,

20 and deprive him of a fair trial." The court noted that it was aware of no authority requiring the

21 government and its witnesses to refrain from using the term "victim," but recognized that,

22 nonetheless, this term "is prejudicial when the core issue at trial is whether a crime has been

23 committed—and, therefore, whether there is a victim." *Id.* Thus, the court concluded that "to label

24 [the alleged victim] as a victim at the outset of trial carries the risk of improperly influencing the

25 jury's decision." *Id.*, at *2. Moreover, the court found "virtually no probative value" in permitting

26 the use of this term, as the alleged victim could be referred to by name or other descriptive terms

27 without preventing the government from presenting its evidence. *Id.*

28         With that said, wholesale preclusion of the word "victim" at trial is not necessarily proper

1   either. For example, in their opening statements, the parties are permitted to outline what they

2   believe, in good faith, that the evidence will show. During closing arguments, they may

3   summarize the evidence that was presented and attempt to persuade the jury as to what

4   conclusions should be drawn from that evidence. *See United States v. Martinez*, 616 F.2d 185,

5   187 (5th Cir. 1980) ("A prosecutor is permitted to state what he believes to have been established

6   by the evidence and to comment fairly upon it.") (cited with approval in *United States v. Gibson*,

7   690 F.2d 697, 703 (9th Cir. 1982)) (concluding on appeal that the evidence at trial showed

8   investors incurred substantial losses at the hands of defendant, and thus, referring to investors as

9   "victims" was a "fair comment on the evidence").

10       In *United States v. Moffit*, 588 F. Supp. 3d 1106, 1117 (D. Idaho 2022), the court cited a

11   lack of authority to support a holding that use of the term "victim" violates a defendant's

12   constitutional rights, including his presumption of innocence and the government's burden of

13   proof. Rather, the court held that "the manner, context, and frequency in which the term is used

14   transforms its meaning and connotations." *Id.* Because the court was unaware of how the term

15   would be used at trial, it declined to generally prohibit its use by way of an *in limine* ruling. *Id.* at

16   1116-17. Instead, it directed the government to submit a proposed curative jury instruction in

17   advance of trial that explained that the term "victim" refers to "a person whom Defendant

18   allegedly subjected to criminal conduct" if it intended to make any such references. *Id.* at 1117.

19       The Court finds this to be the most reasonable approach at this juncture. The Court

20   **GRANTS** the motion to preclude references to MV[8] as "victim," in general. If the government

21   intends to refer to MV as the "victim" outside of its opening statement or closing argument, the

22   government **SHALL** first raise the issue with the Court outside the presence of the jury. meet and

23   confer to attempt to reach an agreement as to a curative jury instruction to the effect Accordingly,

24   the parties **SHALL** also discuss this ruling with any witnesses they intend to call to testify so that

25   they understand they are not to refer to MV as the "victim."

26

27   [8] On a related note, the government indicates that it will refer to MV by full name, as MV is now an adult, though
     any court filings will continue to make anonymized references. (Doc. 151 at 2 n.1.) Gaviola does not propose an

28   alternative to "victim" in her motion in limine and otherwise refers to MV as "minor child." The Court sees no
     problem with the parties referring to MV by his full name or as "minor child," if they choose.

1              4.      Use of Restraints During Transport

2          Defendants seek to exclude evidence that MV was restrained during the transport from

3    California to Missouri on the grounds that it is irrelevant and unduly prejudicial. (Doc. 133 at 20-

4    22.) They submit that despite the TRO in effect at the time of the offense, Gaviola maintained

5    custodial rights over her son under California law, which include "the right and the responsibility

6    to make the decisions relating to the health, education, and welfare of a child." (*Id.* at 20, quoting

7    Cal. Fam. Code §§ 3003, 3006.) Thus, Defendants assert that the use of force in restraining MV

8    was lawful. (*Id.* at 21.)

9          The Court disagrees. This evidence is relevant because it bears directly on an element of

10   the offense; whether Defendants caused MV to travel across state lines "***by force***, coercion,

11   duress, or fraud." 18 U.S.C. § 2262(a)(2) (emphasis added). Sandoval's arguments to the contrary

12   are unsupported and his claim that this force was lawful ignores the terms of the TRO in existence

13   at the time, which prohibited Gaviola from contacting MV or blocking his movements. (*See* Doc.

14   135-1 at 2.) Thus, the evidence that MV was restrained while he was transported to Missouri

15   carries significant probative value. Though it may be prejudicial to Defendants, it is not unfairly

16   so. The motion is **DENIED**.

17              5.      Sandoval's Company Policies

18         Defendants move to preclude the government from eliciting testimony or offering

19   evidence as to whether Sandoval's secure transport company had policies in place to check for

20   existing restraining orders or to coordinate with law enforcement prior to transporting a minor.

21   (Doc. 133 at 22-23.) He contends that this evidence is irrelevant and unfairly prejudicial, because

22   the law does not require him to have these policies. (*Id.*)

23         The government contends that Sandoval's company did not have such policies in place

24   before it transported MV but that Sandoval instituted the policies within 1-2 days of learning that

25   he was transporting MV in violation of a restraining order. (Doc. 150 at 14, citing Doc. 133-1 at

26   35, 49-50.) Therefore, the government asserts that this evidence is relevant to show that Sandoval

27   had knowledge of the TRO's existence and of his wrongdoing—that transporting MV was in

28   violation of the TRO—and yet Sandoval continued to restrain MV at the boarding school for six

1    more days. (*Id.* at 14-16.)

2        As discussed at the hearing, the Court struggles to see how evidence of these policies

3    themselves—whether it be their absence or their creation—amounts to an admission of guilt.

4    Therefore, this evidence—such as the fact that Sandoval lacked these policies when MV was

5    transported, that he indicated to law enforcement an intent to implement these policies following

6    the transport, or that he did, in fact, implement them thereafter—is not relevant to prove a

7    violation of 18 U.S.C. § 2262(a)(2) or otherwise does not bear on the issues to be determined at

8    trial. After all, Sandoval already admitted that he did not have the policies in place when MV was

9    transported. (*See* Doc. 133-1 at 49.) As such, Defendants' motion is **GRANTED**.

10                    6.    MV's Petition for Emancipation

11        Gaviola expects that the government may attempt to introduce MV's petition for

12    emancipation as evidence at trial, "complete with unsupported allegations." (Doc. 132 at 3.) She

13    argues that this filing is not a legitimate court document, but rather, a "self-serving rant of an

14    immature 16-year-old." (*Id.*) The Court interprets Gaviola's motion as a request to exclude the

15    unsupported allegations contained within the petition. In response, the government states that it

16    "intends on redacting the narrative portions of the emancipation petition and does not intend on

17    eliciting testimony about why MV was seeking the emancipation petition or why it was granted,"

18    but "does not foreclose the possibility that they could be used for impeachment purposes." (Doc.

19    150 at 18 n. 6.) Therefore, to this extent, the motion is **GRANTED IN PART**, though the

20    unredacted version may be admissible for impeachment purposes.

21        As to the existence of the emancipation petition and related proceedings, the government

22    expects to show at trial that the emancipation petition and subsequent hearings are relevant for

23    several reasons, including:

24            (1) the petition for emancipation was filed on the same day as the
        petition for the restraining order; (2) the petition for emancipation
25        was supported by MV's father, revealing as false Gaviola's
        assertion that MV's father objected to the petition; (3) receipt of the
26        petition for emancipation was part of the motive for Gaviola to
        violate the restraining order, in order to reassert her control over
27        MV; (4) at a hearing on the petition for emancipation on August 18,
        2021 (three days before the kidnapping), Gaviola was served a copy
28        of the restraining order after falsely stating that she had never been

                                        12

served; (5) also at the hearing, Gaviola falsely told the judge that MV was a resident of Tennessee; (6) the California Superior Court agreed with MV and granted the petition for emancipation over Gaviola's objections; and (7) the emancipation petition undercuts several of Gaviola's arguments regarding her custody and control of MV.

(Doc. 150 at 18.)[9] Though the Court does not read Gaviola's motion as seeking to exclude any reference to the emancipation proceedings themselves, at the hearing, counsel for Gaviola suggested that the filing and Gaviola's knowledge are irrelevant to the crime charged. To this extent, the Court does not find a basis to grant such a request *in limine*. The government is entitled to present evidence that the emancipation proceedings motivated Gaviola's violation of the protection order. Therefore, Gaviola's motion is **DENIED IN PART** in this regard.

### 7.    Character and Bad Acts Evidence

Defendants seek to exclude evidence and references to prior misconduct, lawsuits, or unsubstantiated allegations against Gaviola or Sandoval. Gaviola specifically seeks to exclude allegations contained in MV's TRO petition regarding Gaviola's abusive behavior and other unlawful activities. (Doc. 132 at 4.) Sandoval seeks to preclude references to any ancillary civil lawsuits or criminal inquiries involving him or the boarding school. (Doc. 133 at 25.) The government confirms that it will not offer this evidence in its case-in-chief but may use it as impeachment evidence if Defendants choose to testify. (Doc. 150 at 25.)[10] Therefore, Defendants' motions are **GRANTED**, except that the government may use the evidence as impeachment. If the government sees the need to offer this impeachment evidence against either Gaviola or Sandoval, it **SHALL** notify the Court and the defense in advance.

### 8.    Gaviola's Statements Against Sandoval

Sandoval argues that Gaviola's out-of-court statements are inadmissible against him

---

[9] The government states that it "intends on redacting the narrative portions of the emancipation petition, and does not intend on eliciting testimony about why MV was seeking the emancipation petition or why it was granted," but "does not foreclose the possibility that they could be used for impeachment purposes." (Doc. 150 at 18 n.6.)

[10] The government clarifies that while it "intends to admit certified court records from MV's restraining order case, it will redact all portions of the records containing the allegations of … Gaviola's abuse" and will not elicit testimony regarding MV's allegations in the TRO. (Doc. 150 at 25.)

because they are hearsay, and their introduction would violate the Sixth Amendment. (Doc. 133 at 9.)

### a.    Co-conspirator statements

Sandoval asserts that Gaviola's out-of-court statements are not admissible under the hearsay exception for co-conspirator statements, as provided in Federal Rule of Evidence 801(d)(2)(E). (Doc. 133 at 9-14.) For its part, the government argues that many of Gaviola's and Sandoval's statements *are* co-conspirator statements. (Doc. 150 at 21.)[11]

Under Federal Rule of Evidence 802, hearsay[12] is generally inadmissible. However, a statement that is offered against an opposing party and "made by the party's coconspirator during and in furtherance of the conspiracy," is not hearsay. Fed. R. Evid. 801(d)(2)(E). For such statements to be admissible, the government must demonstrate by a preponderance of the evidence that: (1) a conspiracy existed when the statement was made; (2) both the declarant and the defendant against whom the statement is offered were members of that conspiracy; and (3) the statement was made during the course of, and in furtherance of, the conspiracy. *Id.*; *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). The Ninth Circuit has held that, under Rule 801(d)(2)(E), "[a] coconspirator's statement is admissible upon proof that it was made in furtherance of a conspiracy, notwithstanding the fact that the indictment does not contain a conspiracy count. The question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture …." *United States v. Fries*, 781 F.3d 1137, 1151 (9th Cir. 2015) (quoting *United States v. Manning,* 56 F.3d 1188, 1197 (9th Cir. 1995)).

Sandoval asserts that there is "zero evidence" that Gaviola told him about the TRO against her, and "zero evidence" that he and Gaviola "had any sort of agreement to engage in any criminal activity." (Doc. 133 at 10.) The government advances the following argument in

---

[11] The government also offers other grounds for the admissibility of Gaviola's statements; however, Sandoval does not assert otherwise, and thus, the Court need not reach them. (*See* Doc. 133 at 10 [arguing that because the government cannot prove that a conspiracy existed, "none of the statements made by Ms. Gaviola are admissible against Mr. Sandoval unless they fall under some other exception to the hearsay rule."].)

[12] Hearsay is a statement that, "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).

1    opposition:

2              Here, a conspiracy existed between Gaviola and Sandoval that
          started (at its latest) on the evening of August 21, 2021—when
3         Sandoval learned from police about the domestic violence
          protective order barring Gaviola from any contact with MV—and
4         continued through MV's release to his father on or about August
          29, 2021. Gaviola and Sandoval's text messages with each other
5         during this period from at least August 21, 2021 at 5:55 pm Pacific
          Time through August 28, 2021 at 3:39 pm are admissible. Ex. 16 at
6         17-38. The conspiracy was to violate the restraining order against
          Gaviola by transporting to MV to the boarding school in Missouri
7         and holding him there on Gaviola's behalf. Ample evidence of this
          conspiracy exists from the text messages themselves and from other
8         evidence in this case. The government and Sandoval agree that
          prior to August 21, Gaviola and Sandoval entered into an agreement
9         to restrain MV and drive him to the boarding school in Missouri,
          where he would be involuntarily enrolled as a student and that on
10        August 21-22 that forcible restraint and transportation occurred.
          ECF 1 at 2-4; ECF 133 at 7-9 and Exh. E-F. MV remained there
11        until the boarding school released him to his father.

12   (Doc. 150 at 22.) Thus, the government states that through the text messages and "other

13   independent evidence," it intends to prove that a conspiracy existed between the evening of

14   August 21, 2021, when Sandoval learned about the TRO, and August 29, 2021, when MV was

15   released from the boarding school. (*Id.* at 22-23.) The government argues the text messages

16   between Gaviola and Sandoval that followed "demonstrate that Gaviola and Sandoval operated

17   jointly and collaborated on methods of keeping MV restrained without legal authority," and

18   therefore, they should be admitted. (*Id.* at 23.)

19         The Court finds the government's argument persuasive. Its theory, that a conspiracy

20   existed beginning when Sandoval learned about the TRO, disputes Sandoval's argument that

21   because he was not aware of the TRO, there was no conspiracy. Because it appears that the

22   government will offer evidence that a conspiracy existed between the defendants, at least

23   beginning on August 21, 2021 when Mr. Sandoval learned of the TRO from the transport team

24   and law enforcement, but continued to hold MV at the school and prevent him from having

25   contact with his father and grandmother in concert with Gaviola. Moreover, to the extent that

26   either defendant's statements are admissible for other reasons—such as a statement by a party

27   opponent, non-testimonial statements[13] or testimonial statements that are not offered against the

28   _____
[13] To be clear, testimonial statements are "ex parte in-court testimony or its functional equivalent—that is, material

1 codefendant—they may be admitted. Therefore, the government is entitled to offer evidence to

2 support its theory at trial.

3     Separately, Sandoval asserts that if the government intends to offer Gaviola's statements

4 at trial, it "should have to identify precisely what they plan on eliciting, and under what authority

5 the evidence is admissible against" him. (Doc. 133 at 11.) Specifically, Sandoval asks the Court

6 to require the government to provide a list of statements it intends to introduce at trial[14], along

7 with the following information:

8     a) Source of the alleged coconspirator statement (i.e., text message, Facebook post, interview, etc.);

9

10     b) Identity of the declarant;

11     c) Summary of evidence showing that a conspiracy existed at the time the declarant made the statement;

12     d) Summary of evidence showing that the declarant knew about and participated in the conspiracy; and

13     e) Summary of evidence showing that Mr. Sandoval knew about and participated in the conspiracy.

14

15 (*Id.* at 12.) As another court in this District explained,

16     [A]lthough the Ninth Circuit has not imposed a procedure [for assessing the admissibility of co-conspirator statements], it has

17     approved of one: a co-conspirator's out-of-court statements "may be admitted provisionally subject to later motions to strike." *United*

18     *States v. Batimana*, 623 F.2d 1366, 1369 (9th Cir. 1980); *see also, e.g., Kenny*, 645 F.2d at 1333–34. One advantage of this approach

19     is its potential efficiency. It allows the government to present all of its evidence only once, and it allows the court to have all of that

20     evidence when it decides whether to admit the disputed statements. One disadvantage of this procedure is its obvious risks. If the

21     government does not ultimately prove the underlying conspiracy as alleged, then it may have disclosed inadmissible hearsay to the jury.

22     It may be difficult or even impossible to separate admissible from inadmissible evidence after the fact, which could lead to a mistrial.

23

24 such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar
pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements

25 contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;
statements that were made under circumstances which would lead an objective witness reasonably to believe that the

26 statement would be available for use at a later trial." *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) quoting
*Crawford v. Washington*, 541 U.S. 36, 51-52 (2004).

[14] Mr. Sandoval seems to take the position that every testimonial statement Ms. Gaviola has made, if introduced,

27 violates his right of confrontation. (Doc. 133 at 12) Though clearly statements made by Ms. Gaviola *could* implicate
his confrontation rights, every statement made by her does not necessarily do so. Along these lines, likewise, there is

28 no violation of confrontation rights, if the codefendant's statement 'is redacted to eliminate not only the defendant's
name, but any reference to his or her existence. *Lucero* at 987.

1

> *See Kenny*, 645 F.2d at 1333–34.

2
3
4
5

> Alternatively, a district court could require the government to prove the conspiracy first. The first part of the trial, for example, could be dedicated to proving the conspiracy. Justice Robert Jackson once advocated this procedure in a concurring opinion. *Krulewich v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring). A front-loaded procedure could even begin before trial with an evidentiary hearing before the court only.

6
7
8
9
10
11
12
13
14

> Some courts have sought a middle ground. The Seventh Circuit, for example, has advised district courts to "require the government to preview the evidence which it believes brings the statements within the co-conspirator rule." *United States v. Schoffner*, 826 F.2d 619, 630 (7th Cir. 1987). This "preview" might be as simple as a pretrial proffer to give the district court some comfort a mistrial is unlikely if it permits the government to introduce a co-conspirator's statements conditionally. *See, e.g.*, *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991) (outlining possible procedures). Other courts have addressed the admissibility decision at the pretrial stage but have scrapped the pretrial hearing. The United States District Court for the Northern District of California, for example, has made a preview procedure part of its local rules for criminal cases. It requires the government to disclose a "summary" of any statements it intends to offer under the hearsay exception. N.D. Cal. Crim. L.R. 16-1(c)(4). The summary must include "sufficient detail that the Court may rule on the admissibility of the statement." *Id.*

15
16

> In some cases, a middle-ground solution like this would likely save time and reduce the risk of presenting inadmissible evidence to the jury.

17

*United States v. Yandell*, 2023 WL 2071282, at *2-3 (E.D. Cal. Feb. 16, 2023).

18
19
20
21
22
23
24
25
26
27

In *Yandell*, the defense requested that for every statement the government intended to offer, it should identify "the declarant, the approximate date of the statement, the statement or a summary of the statement, if appropriate, the pertinent event, the source or witness, and an explanation for the admissibility of each statement under the co-conspirator exception and any additional grounds for admissibility." *Yandell*, 2023 WL 2071282, at *5. Given that case's large, complex record and the high costs of such a pretrial procedure, the court instead opted for conditional admission. *Id*. Among other things, the court noted that the government had "already disclosed a great deal of evidence and information about the alleged conspiracy, including in the original and superseding indictments, the 143-page criminal complaint and extensive discovery"; and it had "obtained the convictions of several alleged co-conspirators by guilty pleas," which

28

included "admissions under penalty of perjury that the government could prove the alleged conspiracy." *Id.*

A "middle-ground" situation is most appropriate here, where the risk of the jury hearing evidence that should not have been admitted under the co-conspirator rule is high.  *Yandell*, 2023 WL 2071282, at *3. Thus, though the Court declines to require the information Sandoval proposes, **the government SHALL provide to the defendants any testimonial, co-conspirator statement it intends to offer at least two days in advance of when it intends to introduce the statements UNLESS the statements are sufficiently redacted to remove any references to the other defendant or they do not implicate the other defendant in any fashion[15].** If, after this disclosure, there are disputes as to the statements' admissibility, the parties **SHALL** meet and confer to attempt to resolve these disputes. If they cannot be resolved, they **SHALL** raise the concerns with the Court outside the presence of the jury and well in advance of the presentation of that testimony. Sandoval's motion is, therefore, **GRANTED IN PART** as to this request.

### b.    *Right of confrontation*

Sandoval argues also that if Gaviola does not testify at trial, the introduction of her testimonial statements without an opportunity to cross-examine her would violate Sandoval's right of confrontation under the Sixth Amendment and his right to a fair trial under the Fifth Amendment. (Doc. 133 at 12.)

The government challenges Sandoval's argument only insofar as Sandoval is claiming that "every statement that Ms. Gaviola has made in this case is testimonial." (Doc. 133 at 13; Doc. 150 at 24.) The government concedes that statements that are truly testimonial—such as those made to law enforcement officers—should not be offered against Sandoval. (*Id.*) It also agrees that any of Gaviola's testimonial statements offered against *Gaviola* should be accompanied by a limiting instruction to the jury that such statements are only to be considered as to Gaviola. (*Id.*) Finally, the government clarifies that it does not intend to offer Gaviola's statements against her during its case in chief. (*Id.* at 24 n.7.)

---

[15] Except that, the government has already provided notice at the hearing that it intends to introduce the text messages exchanged between the defendants. To the extent that the defendants believe that a limiting instruction is required, they SHALL meet and confer with the government to develop the proposed instruction.

1    Essentially, the government argues that Sandoval's motion should be denied to the extent

2    it would amount to an adoption of Sandoval's argument that all of Gaviola's statements are

3    testimonial in nature. The Court declines to determine at this juncture which of Gaviola's

4    statements are testimonial and which are not. However, the government's opposition highlights

5    the lack of a dispute here—the government does not intend to offer testimonial statements against

6    Gaviola as part of its case in chief, and any statements it does offer will be on rebuttal. The

7    government will also "tak[e] care to redact any references to" Sandoval and propose a limiting

8    jury instruction. (Doc. 150 at 24.) Therefore, there appears to be no violation of the Confrontation

9    Clause. Sandoval's motion is **DENIED IN PART** to this extent, subject to renewal at trial should

10   such an issue arise.

11       **B.**     **The Government's Motions in Limine**

12           1.



27           . Accordingly, the government asks the Court to exclude any such evidence or

28   argument at trial, including any of Gaviola's subjective beliefs or motives for her actions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1     First, showing "absence of malice" and providing "context" are not permitted uses of

2  other-acts evidence. *See* Rule 404(b)(2) (evidence of other acts permitted for purposes of proving

3  "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack

4  of accident"). As to intent, Gaviola asserts that her subjective, "good faith" belief negates her

5  criminal intent to commit the offense charged. Importantly, though, Gaviola does not dispute that

6  she intended to commit the offense. Rather, she seeks to explain *why* she did it. For purposes of

7  Rule 404(b), such evidence would perhaps be admissible to show lack of intent if that were in

8  dispute, but it is not. At most, then, this evidence would go toward the defenses of justification or

9  necessity, but because with these defenses there can be no dispute that the defendant intended to

10  violate the law, this returns the argument to where it started. Therefore, counsel's argument that

11  this evidence bears on Ms. Gaviola's intent, is not well-taken.

12     In sum, nothing presented by the defense justifies introduction of this information.

13  Gaviola can admit evidence that tends to disprove or negates one of the elements of the offenses.

14  She can offer evidence of a defense, if she chooses. However, Ms. Gaviola has not made any

15  showing that she has evidence to demonstrate the elements of either the defenses of necessity or

16  justification. ███████████████████████████████████████████████

17  ██████████████████████████████████████████████████████████

18  ███████████████████████████████████████████ That is not

19  permitted. Fed. R. Evid. 401, 403. If she *can*, in fact, make such a proffer, she **SHALL** do so

20  outside the presence of the jury and before seeking to introduce any of this evidence. If

21  appropriate, the Court is prepared to reverse its order here. ████████████████

22  ██████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████ For these reasons, the

25  government's motions (Sealed Docs. 102, 141) are **GRANTED.**

26          2.    Validity of TRO

27     Gaviola has advanced various arguments challenging the validity of the restraining order

28  against her, including that "MV's allegations against her were false, the California court could not

interfere with an existing Tennessee court order granting custody of MV to Gaviola, and most recently, that the restraining order interfered with her First Amendment rights." (Doc. 135 at 3.) However, the government contends that neither the TRO's objective validity nor Gaviola's subjective beliefs as to its validity are relevant and therefore, that any such testimony, evidence, and argument should be excluded under Rules 401 and 403. (*Id.* at 3-6.)

Gaviola opposes the government's motion, asserting that "fundamental principles of criminal law" permit the presentation of evidence regarding legitimate defenses, such as justification and necessity. (Doc. 145 at 2-3, citing *People v. Kurr*, 654 N.W.2d 651 (Mich. 2002); *State v. Dobbert*, 797 N.W.2d 522 (Iowa 2011).) She continues that when any such defenses are raised, the circumstances surrounding the TRO, including its validity, become "not only relevant but essential to a fair trial." (*Id.*)

In making this argument, Gaviola misses the mark. The elements of the defense of justification are:

First, the defendant was under an unlawful and present threat of death or serious bodily injury;

Second, the defendant did not recklessly place herself in a situation where she would be forced to engage in criminal conduct;

Third, the defendant had no reasonable legal alternative; and

Fourth, there was a direct causal relationship between the conduct and avoiding the threatened harm.

9th Cir. Manual of Model Crim. Jury Instr. 5.9. The elements of the defense of necessity are:

First, the defendant was faced with a choice of evils and chose the lesser evil;

Second, the defendant reasonably acted to prevent imminent harm;

Third, the defendant reasonably anticipated her conduct would prevent such harm; and

Fourth, there were no other reasonable legal alternatives to violating the law.

9th Cir. Manual of Model Crim. Jury Instr. 5.8.

Notably, in her papers, Gaviola misstates the elements of both defenses, and thus, advances arguments that are nonresponsive to the elements that matter. As to the validity of the protection order, again, Gaviola fails to support her contention that this is, or is related to, an

element of an offense under § 2262(a)(2) to be submitted to the jury. In any event, the government has indicated its intent to lodge a certified copy of the TRO, which, if that occurs, would satisfy the showing that a court issued a protection order in favor of MV and against Ms. Gaviola. Thus, the government's motion (Doc. 135 at 3-6) is **GRANTED**. Unless the government fails to proffer a certified copy of the TRO, the parties **SHALL NOT** argue, intimate, elicit testimony, or present evidence challenging the validity of that underlying order.

**IV.    Conclusion and Order**

Based upon the foregoing, the Court **ORDERS**:

1.     Defendants' motion in limine to exclude post-offense evidence (Doc. 133 at 14-18; Doc. 132) is **DENIED**.

2.     Defendants' motion in limine to exclude TRO service evidence (Doc. 133 at 24-25; Doc. 132) is **DENIED**.

3.     Defendants' motion in limine to preclude use of inflammatory terms (Doc. 133 at 18-20; Doc. 132) is **GRANTED** as to the terms "kidnapping" and "abduction" and "victim."

4.     Defendants' motion in limine to exclude evidence of the use of restraints during MV's transport (Doc. 133 at 20-22; Doc. 132) is **DENIED**.

5.     Defendants' motion in limine to exclude evidence of Sandoval's company policies (Doc. 133 at 22-24; Doc. 132) is **GRANTED**.

6.     Defendant Gaviola's motion in limine to exclude evidence of MV's petition for emancipation (Doc. 132 at 3) is **GRANTED IN PART** and **DENIED IN PART**, as discussed above.

7.     Defendants' motions in limine to exclude character and bad acts evidence (Doc. 133 at 25; Doc. 132) are **GRANTED**.

8.     Defendant Sandoval's motion in limine to preclude the use of Gaviola's statements against Sandoval (Doc. 133 at 9-14) is **GRANTED IN PART** and **DENIED IN PART**, as discussed above.

9.     The government's motions in limine to exclude evidence ██████████,

1    █████████████████████ (Sealed Docs. 102, 141) are **GRANTED**.

2    10.     The government's motion in limine to exclude evidence of the validity of the TRO

3            (Doc. 135) is **GRANTED**.

4    11.     The Clerk of the Court is directed to **TERMINATE** Defendant Sandoval's earlier

5            motions in limine filing (Doc. 115) as **MOOT**.

6

7    IT IS SO ORDERED.

8    Dated: September 23, 2025

9                                                          Jennifer L. Thurston
                                                           UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28