1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9              **EASTERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  UNITED STATES OF AMERICA, | Case No.: 1:22-cr-00233 JLT SKO |
| 12              Plaintiff, | ORDER DENYING DEFENDANT GAVIOLA'S MOTION TO STRIKE AND MOTIONS TO DISMISS |
| 13        v. | |
| 14  SHANA GAVIOLA and JULIO SANDOVAL, | (Docs. 136-138) |
| 15 | |
| 16              Defendants. | |
| 17 | |

The indictment in this case charges Shana Gaviola and Julio Sandoval with interstate violation of a protection order, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2262(a)(2) and 2. (Doc. 1.) Gaviola now moves to dismiss the indictment, asserting that it (1) fails to state an offense under § 2262(a)(2), (2) violates her First Amendment right to free exercise of religion, and (3) is vague, ambiguous, and lacks specificity. (Docs. 137, 138.) She also seeks to strike surplusage from the indictment as irrelevant and prejudicial. (Doc. 136.) The government opposes the motions. (Doc. 144.)

The Court held a hearing on the motions on September 22, 2025. For the reasons discussed on the record and set forth below, the motions are **DENIED**.

///

///

1    **I.    Background**

2    Gaviola is MV's mother. In July 2021, while 16 years old, MV petitioned the Fresno

3    County Superior Court for a temporary restraining order prohibiting Gaviola from, among other

4    things, contacting MV. (Doc. 144-2.) The court issued the order on July 14, 2021. (Doc. 135-1.)

5    Though MV and Gaviola both resided in Fresno County, California at the time the restraining

6    order was issued, they did not reside together. (Indictment, Doc. 1 at 1-2.) Along with the petition

7    for a restraining order, MV also filed a petition to become an emancipated minor. (*Id*. at 2.)

8    On July 15, 2021, an officer of the Clovis Police Department spoke with Gaviola by

9    telephone and explained the terms of the restraining order against her. (Doc. 135-2.) The officer

10   then emailed Gaviola a copy of the order and reviewed it with her again over the telephone. (*Id*.)

11   On August 18, 2021, Gaviola appeared in court at the hearing on MV's petition for emancipation.

12   (Doc. 150-2 at 3.) The Court granted Gaviola's request to continue the hearing to allow her to

13   retain counsel. (*Id*.) At the hearing, the bailiff served Gaviola a copy of the restraining order and a

14   copy of the emancipation petition. (*Id*.)

15   Thereafter, the government alleges that Gaviola arranged with Sandoval to have MV

16   transferred to a religious boarding school in Stockton, Missouri, where Sandoval was the Dean of

17   Students. (Doc. 1 at 2.) Sandoval was also the head of a company that transported minors to

18   various boarding schools across the country. (*Id*.) The government alleges also that Gaviola and

19   Sandoval agreed to send two agents of the transportation company to take physical custody of

20   MV and transport MV from California to Missouri. (*Id*.)

21   The government alleges that on August 21, 2021[1], at the behest of the defendants, the two

22   agents went to MV's workplace. (Doc. 1 at 3.) They restrained MV, directed MV to enter their

23   vehicle, seized MV's iPhone 8, and drove MV for approximately 27 consecutive hours to the

24   boarding school in Missouri. (*Id*.) MV remained restrained for the duration of the drive. (*Id.*)

25   During the drive, law enforcement officers contacted Sandoval by phone and advised him that

26   MV had an active restraining order against Gaviola. (*Id*.) Notwithstanding, Defendants continued

27   to cause and direct the agents to transport MV to Missouri. (*Id.*) Upon arrival in Missouri on

28   _____

[1] The indictment alleges that the event occurred on August 21, 2022, but this appears to be a scrivener's error.

2

August 22, 2021, the agents delivered MV to the boarding school. (*Id.*) At the command,

direction, and control of Sandoval, school staff members detained MV within the facility despite

requests by MV's father to release MV into his custody. (*Id.*) After approximately eight days of

detention, MV was released to the father's custody. (*Id.*)

## II.    Analysis

### A.    Motion to Strike (Doc. 136)

Federal Rule of Criminal Procedure 7(d) states that a court "may strike surplusage" from

the indictment. Fed. R. Crim. P. 7(d); *see also United States v. Jenkins*, 785 F.2d 1387, 1392 (9th

Cir. 1986) ("Insofar as the language of an indictment goes beyond alleging elements of the crime,

it is mere surplusage that need not be proved."). The purpose of Rule 7(d) "is to protect a

defendant against prejudicial or inflammatory allegations that are neither relevant nor material to

the charges." *United States v. Ramirez*, 710 F.2d 535, 544-45 (9th Cir.1983); Fed. R. Crim. P.

7(d) advisory committee's note. The decision to strike surplusage is subject to the district court's

discretion. *United States v. Laurienti*, 611 F.3d 530, 546-47 (9th Cir. 2010).

The allegations must be both irrelevant *and* prejudicial to be stricken. If language in an

indictment constitutes information that is relevant to the charges or is what the government

intends to prove at trial, it is not surplusage and no prejudice inquiry is necessary. *See Laurienti*,

611 F.3d at 546 ("Even if the use of the word 'unlawful' could be considered prejudicial, we hold

that the district court nevertheless did not abuse its discretion because the allegation was

relevant."); *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993) ("For language to be

struck from an indictment, it must be irrelevant, inflammatory, and prejudicial."). Moreover, even

if an allegation appears to bear no relevance, if it also does not prejudice the defendant, it is

"harmless" and need not be stricken. *Jenkins*, 785 F.2d at 1392 (finding that "inclusion [of

surplusage] was harmless" because allegation of federal insurance, though not an element of the

crime, did not prejudice defendants).

Gaviola seeks to strike paragraphs 2, 4, and 6 of the indictment in this case, asserting they

are irrelevant and prejudicial. (Doc. 136.) The government argues in opposition that (1) the

identified language is relevant to the charge against Gaviola, and (2) there is no identified

1  prejudice because the language is not inflammatory, and the indictment will not be provided to

2  the jury. (Doc. 144 at 8.)

3             1.    Use of term "victim" and Gaviola's relationship with MV

4       Gaviola seeks to strike the entirety of paragraph 2 of the indictment, which alleges:

5            Defendant Gaviola was the mother of a minor child, ("Minor Victim"
          or "MV"). Beginning in 2020, MV lived separate and apart from

6            defendant Gaviola with another family in Fresno County, within the
          state and Eastern District of California.

7  (Doc. 1 at 1 ¶ 2.)

8       Gaviola argues this paragraph should be stricken because (1) references to the minor child

9  as "Minor Victim" or "victim" are prejudicial; and (2) allegations that Gaviola "was" the mother

10  of MV inaccurately imply that this is no longer the case. (Doc. 136 at 3-4.)

11       As to use of the term "was," to describe Gaviola's relationship to MV, the entire

12  indictment is written in the past tense because it pertains to the specific time frame alleged

13  therein. Therefore, as the government notes, "[i]t is neither surplusage nor prejudicial for the

14  entire Indictment to be pleaded in the past tense, even if certain facts remain true at the time of

15  trial. This is because the grand jury cannot predict the future, but can only render a true bill based

16  on the facts presented to it at the time of charging." (Doc. 144 at 11.)

17       As to references to MV as a "victim," Gaviola argues that the jury has not yet determined

18  that MV is a victim. However, this is true for every allegation in the indictment; none of them

19  have been proven. Surely the Court cannot be expected to strike every allegation in the indictment

20  for this reason. These allegations provide Defendants with notice of the charges against them,

21  which includes identifying the individual protected by the protection order at issue. Furthermore,

22  the jury will be instructed that the charges in the indictment are not evidence, and that Defendants

23  are presumed innocent. *See* Ninth Circuit Model Jury Instruction 1.2.  Finally, the jury will not

24  receive a copy of the indictment and MV will not be referred to as "Minor Victim" at trial. The

25  government stated its intent to use MV's name, as he is no longer a minor.

26       As for the remaining portion of paragraph 2, it contains essential information about venue

27  and gives context for the relations between the parties. Importantly, Gaviola does not argue that

28  these allegations are irrelevant. Because allegations must be both irrelevant *and* prejudicial,

1    Gaviola has not demonstrated that this language should be stricken. The motion is **DENIED** as to

2    this request.

3                      2.    Allegations related to MV's emancipation petition

4        Gaviola also seeks to strike paragraph 4 of the indictment, which alleges:

5            On or about the same date [July 13, 2021], MV also petitioned the
     Fresno County Superior Court to be declared an emancipated minor.

6            When a court declares a minor to be emancipated, that minor
     becomes free from the custody of the minor's parents and assumes

7            many legal rights of an adult.

8    (Doc. 1 at 2 ¶ 4.) Gaviola argues that these allegations are "completely irrelevant and immaterial

9    to any issue to be determined by this jury." (Doc. 136 at 3.) She argues also that "the mere filing

10   of a petition, any petition, in any court, by any litigant, is simply an act of presenting untested

11   claims which are unworthy of belief absent proof." (*Id.*)

12       Gaviola submitted a similar motion in limine challenging the prejudicial effect of the

13   "self-serving" allegations contained within MV's emancipation petition. (*See* Doc. 132 at 3.) As

14   the Court's order on the motions in limine noted, the government "intends on redacting the

15   narrative portions of the emancipation petition, and does not intend on eliciting testimony about

16   why MV was seeking the emancipation petition or why it was granted," but "does not foreclose

17   the possibility that they could be used for impeachment purposes." (Doc. 150 at 18 n.6.)

18   Furthermore, the government specified that it expects to prove at trial that the emancipation

19   petition is relevant for multiple reasons. (*See id.* at 18.) The Court also agrees with the

20   government that the allegations in paragraph 4 the indictment serve to give notice to Defendants

21   of the government's theory of the case.

22       The Court does not reach Gaviola's arguments related to the substance of the petition, or

23   how the jury may perceive the petition based on the document's court stamp, because the

24   document itself is not part of the indictment that Gaviola now seeks to strike. Therefore, the

25   motion is **DENIED** as to this request. To the extent it seeks to preclude the introduction of this

26   material, it is **GRANTED** such that the Government SHALL redact this material from the

27   exhibit.

28   ///

1        3.    Use of the term "served"

2    Gaviola also seeks to strike paragraph 6 of the indictment, which alleges:

3        Officers of the Clovis Police Department served Gaviola with the
         restraining order by email on July 15, 2021 and confirmed with
4        Gaviola that she had received it. MV's attorney also served Gaviola
         in person with the restraining order on August 18, 2021.
5

6    (Doc. 1 at 2 ¶ 6.) Gaviola asserts that use of the term "served" is irrelevant, prejudicial, and risks

7    confusing the jury, as "proper service of a restraining order is essential to its validity." (Doc. 136

8    at 4.)

9        Again, these allegations confirm when the government believes Gaviola was on notice of

10   the restraining order, which is relevant to prove Gaviola's criminal intent to violate it. Moreover,

11   the evidence indicates that no later than August 18, 2021, she was "served" with the documents

12   when the attorney caused the bailiff to provide the documents to her while she appeared at the

13   initial hearing on the emancipation petition. (Doc. 150-2 at 3.) In sum, these allegations are

14   relevant and there is no prejudice because the indictment will not be provided to the jury.

15   Accordingly, Gaviola's motion to strike (Doc. 136) is **DENIED** in its entirety.

16       **B.    Motions to Dismiss (Docs. 137, 138)**

17       In weighing a motion to dismiss under Federal Rule of Criminal Procedure 12, courts

18   must accept each factual allegation in the indictment and draw all reasonable inferences from

19   those facts in favor of the government. *United States v. Milovanovic*, 678 F.3d 713, 717 (9th Cir.

20   2012). "A pretrial motion is generally capable of determination before trial if it involves questions

21   of law rather than fact." *United States v. Shortt Acct. Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986)

22   (internal quotation marks omitted). A court should deny a motion to dismiss if any properly

23   instructed jury could convict on the facts alleged. *See Milovanovic*, 678 F.3d at 717.

24       1.    Failure to state an offense

25       Broken down into its component parts, 18 U.S.C. § 2262(a)(2) requires the government to

26   prove that: (1) the defendant caused another person to travel in interstate or foreign commerce by

27   force, coercion, duress, or fraud; and (2) in the course of, as a result of, or to facilitate such

28   conduct or travel, the defendant engaged in conduct that violated the portion of a protection order

that prohibited or provided protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person. *See* 18 U.S.C. § 2262(a)(2)[2]; Ruschky & Shealy, *Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina*, p. 429 (2024 Online Edition); *United States v. McNeil*, 2021 WL 3686624, at *2 (D. Haw. Aug. 19, 2021), *aff'd*, 2022 WL 1686674 (9th Cir. May 26, 2022) (similar instructions for 18 U.S.C. § 2262(a)(1)); *United States v. Green-Remache*, 97 F.4th 30, 33-34 (D.C. Cir. 2024).[3]

Gaviola argues that the government fails to sufficiently plead a violation of 18 U.S.C. § 2262(a)(2) because her "act of having her minor child transported to attend a Christian school in another state does not constitute conduct that violates a protection order's prohibitions against violence, threats, harassment, or contact." (Doc. 137 at 4.) Importantly, Gaviola does not dispute that she caused MV to travel across state lines or that she was aware of the TRO and its terms at when she made that decision. She only claims that her conduct did not violate the terms of the TRO, without any explanation as to how she reached this conclusion. In any event, this argument is without merit, as Court must accept the facts alleged in the indictment as true.

The indictment alleges that "[o]n July 14, 2021, a Fresno County Superior Court judge signed and issued a temporary restraining order pursuant to MV's request for a domestic violence restraining order." (Doc. 1 at 2 ¶ 5.) It alleges that the TRO, among other provisions, "mandated

---

[2] In its entirety, 18 U.S.C. § 2262(a)(2) provides:

> **(2) Causing travel of victim.**—A person who causes another person to travel in interstate or foreign commerce or to enter or leave Indian country by force, coercion, duress, or fraud, and in the course of, as a result of, or to facilitate such conduct or travel engages in conduct that violates the portion of a protection order that prohibits or provides protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person or the pet, service animal, emotional support animal, or horse of that person, or that would violate such a portion of a protection order in the jurisdiction in which the order was issued, shall be punished as provided in subsection (b).

[3] Gaviola erroneously outlines the elements of a charge under 18 U.S.C. § 2262(a)(1), which is not alleged in the indictment. (*See* Doc. 137 at 4.) Moreover, she inaccurately cites the case authority she relies upon. (*See id.,* citing *United States v. Casciano*, 927 F.3d 216, 220 (3d Cir. 2019).) The correct citation is *United States v. Casciano*, 124 F.3d 106, 110 (2d Cir. 1997). 927 F.3d 216, on the other hand, falls within a case from the Fourth Circuit, *United States v. Hill*, 927 F.3d 188 (4th Cir. 2019), which does not pertain to 18 U.S.C. § 2262 whatsoever.

Therefore, the Court rejects Gaviola's assertion that "the government must prove: (1) the defendant traveled in interstate commerce; (2) with the intent to engage in conduct that violates a valid protection order; and (3) the conduct actually violated the protection order." (Doc. 137 at 4.) Moreover, setting aside Gaviola's citation to a nonexistent statute (18 U.S.C. § 2262.B), the Court rejects her argument that "[w]ithout evidence of intent to engage in prohibited conduct or an actual violation, the indictment fails to state an offense under 18 U.S.C. § 2262.B," as it is clear that this argument is also based on the misconception that the elements of § 2262(a)(1) are somehow applicable to this case.

that defendant Gaviola could not harass, strike, threaten, assault, hit, follow, stalk, molest, disturb the peace, keep under surveillance, or block the movements of MV." (*Id.*) The indictment further alleges that the TRO "prohibited defendant Gaviola from contacting MV directly or indirectly in any way" and "that only MV could use, control and possess MV's iPhone8." (*Id.*) It also alleges that the TRO "advised defendant Gaviola that she could be charged with a federal crime" if she caused MV to travel out of California. (*Id.*)

The indictment alleges that Gaviola and Sandoval agreed to send two individuals "to take physical custody of MV and transport MV from California to Missouri," and that Sandoval "engaged [the] two individuals to perform the transport." (Doc. 1 at 2 ¶ 7.) It alleges that the individuals "acted at all times under the command, direction, and control of" Defendants. (*Id.* at 2-3 ¶ 8.) It also alleges that on August 21, 2021, Gaviola provided MV's location to the individuals so that the individuals could effectuate the transport. (*Id.* at 3 ¶ 9.) It alleges that the individuals "took hold" of MV, handcuffed him, removed his iPhone 8 from his possession, and drove him, who remained restrained, from California to Missouri. (*Id.*) Despite being contacted by law enforcement and notified that MV's transport was in violation of the TRO, the indictment alleges that Defendants caused and directed the individuals to continue driving. (*Id.* ¶ 10.)

Finally, the indictment alleges:

> Between on or about August 18, 2021 and August 29, 2021, defendants Gaviola and Sandoval, and individuals acting under their command and under their direction and control, knowingly caused MV to travel in interstate commerce by force, coercion, duress, and fraud, and in the course of, as a result of, and to facilitate such conduct and travel, defendants Gaviola and Sandoval, and individuals acting under their command and under their direction and control, engaged in conduct that violated a portion of a protection order against defendant Gaviola in Fresno County, which prohibited and provided protection against violence, threats, and harassment against, contact and communication with, and physical proximity to MV, and would violate such portion of a protection order in the jurisdiction in which the order was issued. Specifically, defendants Gaviola and Sandoval violated and caused the violation of, and aided and abetted the violation of, the temporary restraining order issued by the Superior Court of Fresno County California on July 14, 2021, prohibiting defendant Gaviola from harassing, striking, threatening , assaulting , hitting, following , stalking, molesting, disturbing the peace, keeping under surveillance, and blocking the movements of MV, and contacting MV in any way, including directly or indirectly, and from denying MV the use, control, and possession of MV's

1    iPhone 8.

2    (Doc. 1 at 3-4 ¶ 12.) These allegations are sufficient to plead a violation of 18 U.S.C.

3    § 2262(a)(2). Gaviola's motion is **DENIED** on this ground.

4           2.     Violation of the Free Exercise Clause of the First Amendment

5         As our high court recently reminded us,

6            At its heart, the Free Exercise Clause of the First Amendment
     protects "the ability of those who hold religious beliefs of all kinds
7            to live out their faiths in daily life through the performance of"
     religious acts. *Kennedy*, 597 U.S. at 524, 142 S.Ct. 2407 (internal
8            quotation marks omitted). And for many people of faith across the
     country, there are few religious acts more important than the
9            religious education of their children. *See Our Lady of Guadalupe
     School v. Morrissey-Berru*, 591 U.S. 732, 754, 140 S.Ct. 2049, 207
10           L.Ed.2d 870 (2020) ("Religious education is vital to many faiths
     practiced in the United States"). Indeed, for many Christians, Jews,
11           Muslims, and others, the religious education of children is not merely
     a preferred practice but rather a religious obligation. *See id.*, at 754–
12           756, 140 S.Ct. 2049. The parent petitioners in this case reflect this
     reality: they all believe they have a "sacred obligation" or "God-
13           given responsibility" to raise their children in a way that is consistent
     with their religious beliefs and practices. App. to Pet. for Cert. 531a,
14           538a, 543a, 625a.

15           The practice of educating one's children in one's religious beliefs,
     like all religious acts and practices, receives a generous measure of
16           protection from our Constitution. "Drawing on 'enduring American
     tradition,' we have long recognized the rights of parents to direct 'the
17           religious upbringing' of their children." *Espinoza*, 591 U.S. at 486,
     140 S.Ct. 2246 (quoting *Yoder*, 406 U.S. at 213–214, 232, 92 S.Ct.
18           1526). And this is not merely a right to teach religion in the confines
     of one's own home. Rather, it extends to the choices that parents wish
19           to make for their children outside the home. It protects, for example,
     a parent's decision to send his or her child to a private religious
20           school instead of a public school. *Pierce v. Society of Sisters*, 268
     U.S. 510, 532–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

21   *Mahmoud v. Taylor*, 606 U.S. ----, 145 S. Ct. 2332, 2351 (2025).

22        A Free Exercise challenge requires a plaintiff to allege that the government has burdened

23   one of his religious practices or operates against the practice of his religion. *Cal. Parents for the*

24   *Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1019 (9th Cir. 2020).

25        Gaviola asserts that her decision to cause her child, MV, to cross state lines in order to

26   enroll him in a Christian school "reflects her sincerely held religious beliefs and her absolute right

27   to direct her child's religious and moral education." [4] (Doc. 137 at 6, 8.) As such, she claims that

28   _____

[4] At the hearing, the Court indicated it would allow Gaviola to examine MV about his religious upbringing outside

1  "[p]rosecuting her under 18 U.S.C. § 2262 for this conduct imposes a substantial burden on her

2  free exercise of religion, as it effectively penalizes her for making a constitutionally protected

3  choice." (*Id.* at 7.) Relying on *Mahmoud* and *Bates v. Pakseresht*, 146 F.4th 772 (9th Cir. 2025),

4  she asks the Court to analyze her First Amendment claim under strict scrutiny. (*See id.* at 7-9.)

5  However, the Court does not find that strict scrutiny is triggered here.

6            *a.*        *Constitutionality of 18 U.S.C. § 2262(a)(2)*

7              *i.*        *Neutral laws of general applicability*

8        In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S.

9  872 (1990), the Supreme Court held that "a plaintiff may carry the burden of proving a free

10  exercise violation in various ways, including by showing that a government entity has burdened

11  his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"

12  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Smith*, 494 U.S. at 879-81).

13  If a plaintiff makes such a showing, the government must satisfy strict scrutiny "by demonstrating

14  its course was justified by a compelling state interest and was narrowly tailored in pursuit of that

15  interest." *Kennedy*, 597 U.S. at 526 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*,

16  508 U.S. 520, 546 (1993)). On the other hand, Smith departed from its prior precedents when it

17  held that a law may be enforced against religious objectors if it is neutral and generally

18  applicable, even if it incidentally burdens religious practices. *See Smith,* 494 U.S. at 878.

19        "[I]f the object of a law is to infringe upon or restrict practices because of their religious

20  motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533; *see also Fulton v. City of*

21  *Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021) ("Government fails to act neutrally when it

22  proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious

23  nature."). "A law is not generally applicable if it invites the government to consider the particular

24                          

the presence of the jury. Upon reflection, the Court sees no need for this testimony. The Court does not question

25  Gaviola's religious commitment or her religious sincerity. To the contrary, it presumes her commitment to a
parochial school for the child was the result of her sincerely held belief regardless of the number of times she took

26  her child to church, caused him to be taken to church, or the extent of her religious practices or observances in her
home. Thus, no matter how her child testified about his religious upbringing, this would have no impact on the

27  Court's ruling here. "Whether a belief is religious should not 'turn upon a judicial perception of the particular belief
or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in

28  order to merit First Amendment protection.'" *Detwiler v. Mid-Columbia Med. Ctr.*, No. 23-3710, 2025 WL 2700000,
at *6 (9th Cir. Sept. 23, 2025) (quoting *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)).

1  reasons for a person's conduct by creating a mechanism for individualized exemptions," or "if it

2  prohibits religious conduct while permitting secular conduct that undermines the government's

3  asserted interests in a similar way." *Fulton*, 593 U.S. at 523, 534.

4      Section 2262 is neutral. It does not single out religion or religiously motivated conduct for

5  special burdens; it applies regardless of the defendant's beliefs. It is generally applicable because

6  it uniformly prohibits *all* persons from violating protection orders; it does not afford discretion to

7  grant exceptions for secular motivations (e.g., employment, education, medical reasons) while

8  denying them for religious ones. The government's interest—interstate enforcement of state court

9  orders and protection of victims of domestic violence—applies equally across the board. Thus,

10  under *Smith*, § 2262 is a classic example of a neutral, generally applicable law whose

11  enforcement does not trigger strict scrutiny, even if a defendant claims her conduct was

12  religiously motivated.

13      Defendant's reliance on *Mahmoud* does not resolve this issue. In *Mahmoud*, the Supreme

14  Court addressed whether a public school district's curricular policy, which introduced LGBTQ+-

15  inclusive storybooks into the elementary curriculum while discontinuing advance parental notice

16  and opt-out provisions, directly burdened parents' free exercise rights by compelling their

17  children to participate in instruction contrary to the parents' religious beliefs. 145 S. Ct. at 2341-

18  42. Unlike *Mahmoud*, the prosecution of Gaviola does not arise from government-imposed

19  curricular choices, but from Gaviola's conduct in contravention of a neutral, generally applicable

20  law and a judicial order protecting the child. The Free Exercise Clause does not confer a license

21  to disregard either one; it serves as a shield against government interference with religious

22  practice, not as a sword to immunize individuals from the legal consequences of their own

23  actions. *See Civil Rights Cases*, 109 U.S. 3, 11 (1883); *Manhattan Cmty. Access Corp. v. Halleck*,

24  587 U.S. 802, 808 (2019).

25      Moreover, *Mahmoud* highlights the religious rights of parent *in the absence of* an

26  opposing interest of similar magnitude. To be sure, parents possess fundamental constitutional

27  rights to direct the upbringing of their children, but contrary to Gaviola's assertions, those rights

28  are not absolute. They necessarily yield when confronted with compelling government interests

1   (e.g., child protection, enforcement of court orders, prevention of interstate abduction). *See*

2   *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944) ("[p]arents may be free to become martyrs

3   themselves. But it does not follow they are free … to make martyrs of their children"); *Wisconsin*

4   *v. Yoder*, 406 U.S. 205, 233-34 (1972) ("the power of the parent, even when linked to a free

5   exercise claim, may be subject to limitation under [*Prince*] if it appears that parental decisions

6   will jeopardize the health or safety of the child").

7        Gaviola also relies upon *Bates v. Pakseresht*, 146 F.4th 772 (9th Cir. 2025), which

8   reinforces the principles articulated in *Smith*. The *Bates* Court considered a civil challenge to

9   Oregon's foster-care certification rules, one of which required foster and adoptive applicants to

10  agree to "respect, accept, and support" an adopted child's diverse sexual orientation, gender

11  identity, and gender expression (SOGIE). *Id*. at 777-78. This required applicants to use a child's

12  preferred pronouns, facilitate access to gender-transition care, and take the child to "affirming

13  events like Pride parades." *Id.* at 781, 789.

14       The Ninth Circuit concluded that, unlike the challenged law in *Smith*, Oregon's rule was

15  not neutral or generally applicable because it compelled speech and required affirmation of a

16  particular ideology, and burdened religious applicants who held contrary beliefs by effectively

17  conditioning eligibility on supporting a child's diverse SOGIE. *Bates*, 146 F.4th at 791-98. It also

18  gave the state discretion in how it evaluated applicants; officials were able to make "ad hoc,"

19  individualized assessments when deciding whether an applicant met certification requirements.

20  Thus, case workers could consider some applicants' personal circumstances or statements and

21  still approve them, while categorically denying religious applicants who took a different stance on

22  LGBTQ+ rights. *See id.* at 796-98. Therefore, the Court concluded that the rule was subject to

23  strict scrutiny under the Free Exercise Clause. *Id.* at 798-801. Unlike the foster-care rule in *Bates*,

24  18 U.S.C. § 2262(a)(2) prohibits *all* persons from violating valid protection orders through

25  interstate conduct, provides no discretion to make individualized determinations, and does not

26  single out or target religiously motivated conduct.

27       Along with these factual distinctions is perhaps the most glaring: neither *Mahmoud* nor

28  *Bates* involved a parent asserting their constitutional right to direct their child's religious

1  upbringing *while also* being subject to a restraining order prohibiting contact with that child.

2  Thus, these cases do not provide a constitutional basis to dismiss the indictment in this case.

3  Moreover, if the Court set aside *Smith* and applied strict scrutiny, Gaviola's arguments still fails.

*ii.*        *Strict scrutiny under the RFRA*

5  In the wake of the Supreme Court's holding in *Smith*, Congress enacted the Religious

6  Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.,* "to provide greater

7  protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574

8  U.S. 352, 357 (2015). The RFRA's stated purposes are:

> (1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
>
> (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

13  42 U.S.C. § 2000bb(b). Accordingly, under the RFRA, the government "shall not substantially

14  burden a person's exercise of religion even if the burden results from a rule of general

15  applicability," unless "it demonstrates that application of the burden to the person . . . (1) is in

16  furtherance of a compelling governmental interest; and (2) is the least restrictive means of

17  furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

18  Gaviola does not raise a claim or defense under the RFRA. However, whether under

19  Gaviola's interpretation of a First Amendment challenge or one under the RFRA, the "net effect"

20  is the same: "the government may substantially burden a person's exercise of religion if and only

21  if the government's action can survive 'strict scrutiny.'" *Apache Stronghold v. United States*, 101

22  F.4th 1036, 1058 (9th Cir. 2024), *cert. denied,* 145 S. Ct. 1480 (2025) (citing *Gonzales v. O*

23  *Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430 (2006)).

24  As previously discussed, the Court does not doubt the sincerity of Gaviola's religious

25  beliefs. The Court will also assume, without deciding, that prosecution under 18 U.S.C.

26  § 2262(a)(2) substantially burdens her exercise of religion. Even so, the government's interests

27  are compelling.

28  The federal government has a paramount interest in protecting victims of domestic

1    violence, including by ensuring the enforceability of state-court protection orders and preventing

2    their evasion through interstate travel. Enforcing § 2262—as well as other provisions of the

3    Violence Against Women Act[5]—advances these compelling interests, such as safeguarding

4    children, upholding judicial orders, and deterring interstate abduction. *See United States v. Page*,

5    167 F.3d 325, 328 (6th Cir. 1999) (noting that "gaps and inadequacies of state law enforcement

6    were among the main reasons for which federal legislation dealing with domestic violence was

7    thought to be necessary"). As further explained in *Page*, Congress enacted the VAWA to address

8    "the problem of batterers who make their crimes more difficult to discover and prosecute by

9    carrying or forcing their intimate partners across state lines." *Id*. This rationale applies equally to

10    the situation here, to protect a child, as to whom a court determined was placed a

11        Section 2262(a)(2) is narrowly tailored in several respects. First, it applies only when

12    there a court has issued a state protection order, and only when the defendant causes coerced

13    interstate travel of another person in violation of that order. It does not bar voluntary contact or

14    religious practice in general—it bars coercive conduct that directly contravenes a state court's

15    individualized judicial determination of danger. *Page* is instructive in showing that Congress

16    drafted § 2262(a)(2) with particular precision, targeting only the narrow circumstance in which an

17    offender forces another person to cross state lines in violation of a protection order—an approach

18    notably more specific than some neighboring VAWA provisions. *Page*, 167 F.3d at 326.

19        Finally, § 2262(a)(2) uses the least restrictive means of protecting victims because it relies

20    on, and gives effect to, a state court's individualized determination that a protection order is

21    necessary. Federal involvement is not triggered unless and until interstate boundaries are

22    crossed—precisely the point at which state enforcement of the protective order fails—ensuring

---

23    [5] The Sixth Circuit's discussion of the VAWA's genesis is enlightening:

24        As a response to the "escalating problem of violence against women" and in recognition of the severe
        toll such crimes have on our society in terms of "health care, criminal justice, and other social costs,"
25        Congress enacted in 1994 the Violence Against Women Act ("VAWA" or the "Act"). s.Rep. No.
        103–138, at 37, 41 (1993) (proposed VAWA of 1993); *see* Pub.L. No. 103–322, 108 Stat. 1796,
26        1902–55 (1994). Among numerous other provisions, the Act criminalized interstate domestic
        violence and interstate violation of protection orders. *See* VAWA § 40221(a), 108 Stat. at 1926–31,
27        18 U.S.C. §§ 2261, 2262. While Congress was particularly concerned with those crimes that
        "disproportionately burden women," s.Rep. No. 103–138, at 37, the criminal provisions are gender-
28        neutral, and enforcement has been gender-neutral as well.

*United States v. Page*, 167 F.3d 325, 326 (6th Cir. 1999).

1  nationwide enforceability of state protection orders without creating new federal substantive law

2  or burdening more religious conduct than necessary. The Court sees no less restrictive alternative

3  that would equally protect victims while still giving effect to protection orders beyond state lines.

4      In sum, even assuming strict scrutiny applied, 18 U.S.C. § 2262(a)(2) would survive. It is

5  narrowly tailored to criminalize only coercive interstate conduct that undermines the effect of

6  state protection orders. And though it may incidentally burden religion, it advances compelling

7  interests—victim safety and the interstate enforceability of court orders—and does so through the

8  least restrictive means—by deferring to protections already considered by the issuing state court

9  and by limiting federal involvement to interstate travel.

10      *b.    Constitutionality of the TRO*

11      At the hearing, Gaviola advanced the argument that because the July 14, 2021 restraining

12  order was a temporary order of "questionable validity" that was issued *ex parte*, it deserves less

13  value when juxtaposed against one's First Amendment right to dictate their child's religious

14  upbringing. This appears to be an extension of Gaviola's challenge to the TRO's validity, which

15  the Court has repeatedly rejected both on the record and in its order on the motions in limine.

16  Assuming the government submits a certified copy of the TRO as indicated, the certified copy

17  demonstrates its validity, and **no evidence or argument challenging the validity of that**

18  **underlying order will be permitted**. *See United States v. James*, 162 F. Supp. 3d 1201, 1204

19  (M.D. Ala. 2016).

20      Insofar as Gaviola's motion can be construed as a constitutional challenge to the TRO,

21  this argument also fails. Such a collateral attack on the state court determination is not permitted

22  in federal criminal cases such as this. The Supreme Court has consistently held that a defendant in

23  a federal prosecution generally may not re-litigate the constitutionality of a prior state judgment

24  that serves as the basis for federal liability. *See Custis v. United States*, 511 U.S. 485, 497 (1994)

25  (holding that a defendant charged under § 922(g) could not collaterally attack prior state

26  convictions on constitutional grounds, except for denial of counsel); *Lewis v. United States*, 445

27  U.S. 55, 65–67 (1980) (upholding firearms conviction even though the underlying felony might

28  itself have been subject to constitutional challenge, because Congress made the "fact of

1    conviction" dispositive). As one court explained, "[w]hether a predicate offense—or, by

2    extension, a criminal or civil court order—is subject to collateral attack during a subsequent

3    criminal prosecution is merely a question of legislative intent." *United States v. James*, 162 F.

4    Supp. 3d 1201, 1203 (M.D. Ala. 2016) (citing *Lewis*, 445 U.S. at 60–65).

5         This principle reflects principles of "comity" and "finality": federal courts respect state

6    judgments unless overturned through the proper appellate process. *See Younger v. Harris*, 401

7    U.S. 37, 44 (1971) (federal courts must avoid interfering with state judicial proceedings out of

8    respect for comity); *Allen v. McCurry*, 449 U.S. 90, 96 (1980). It is also consistent with the

9    collateral bar rule, which requires parties to comply with court orders unless and until they are set

10   aside. *See Walker v. City of Birmingham*, 388 U.S. 307, 320-21 (1967).

11        Congress mirrored this approach in 18 U.S.C. § 2265, which limits enforcement under

12   § 2262 to "protection orders" issued by a court with jurisdiction and after "reasonable notice and

13   opportunity to be heard." 18 U.S.C. § 2265(b)(2).[6] Section 2265 is significant because it reflects

14   Congress's intent to limit federal prosecutions to procedurally valid orders, while leaving

15   substantive constitutional challenges—such as free exercise arguments—to state courts and, if

16   warranted, the U.S. Supreme Court. *See James*, 162 F. Supp. 3d at 1203-04 (M.D. Ala. 2016))

17   (denying motion to dismiss indictment premised on claim that protective order was facially

18   invalid, reasoning that § 2265(b) defines when an order qualifies for federal enforcement). Thus,

19   though Gaviola may argue that § 2262 itself is unconstitutional, she may not collaterally attack

20   the underlying protective order in this Court. For these reasons, Gaviola's motion to dismiss

21   (Doc. 137) is **DENIED** in its entirety.

22              3.    Vagueness, ambiguity, and lack of specificity

23        An indictment must provide defendants with a description of the charges against them that

24   is sufficient: (1) to enable them to prepare their defense; (2) to ensure that they are being

---

25   [6] Section 2265 provides that a protection order that complies with subsection(b) issued by one state "shall be

26   accorded full faith and credit by the court of another State." 18 U.S.C. § 2265(a). A protection order is consistent
     with subsection(b) if: (1) the issuing state court "has jurisdiction over the parties and matter" under that state's laws;

27   and (2) "reasonable notice and opportunity to be heard is given to the person against whom the order is sought
     sufficient to protect that person's right to due process. In the case of ex parte orders, notice and opportunity to be

28   heard must be provided within the time required by State . . . law, and in any event within a reasonable time after the
     order is issued, sufficient to protect the respondent's due process rights." 18 U.S.C. § 2265(b)(2).

prosecuted on the basis of facts presented to the grand jury; (3) to enable them to plead double jeopardy against a later prosecution; and (4) to inform the court of the facts alleged so that it can determine the sufficiency of the charge. *Jenkins*, 785 F.2d at 1392. "The test for sufficiency of the indictment is not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (quoting *United States v. Hinton*, 222 F.3d 664, 672 (9th Cir. 2000) (internal quotation marks omitted)).

"[A]n indictment is not to be read in a technical manner, but is to be construed according to common sense with an appreciation of existing realities." *United States v. Anderson*, 532 F.2d 1218, 1222 (9th Cir. 1976); *see also See Simpson v. United States,* 289 F. 188, 189 (9th Cir. 1923) (approving an indictment if "[i]ts meaning is plain" and "a person of ordinary intelligence could not be misled as to the nature of the charge"); *United States v. Luong,* 965 F.3d 973, 985 (9th Cir. 2020) (finding an indictment sufficient where it named the charges against the defendant but did not identify facts for every element of every charge).

Gaviola seeks dismissal of the indictment on the grounds that it does not provide a clear, concise, and definite statement of the essential facts constituting the alleged offense, and therefore, that it is vague, ambiguous, and lacks factual specificity as required by Federal Rule of Criminal Procedure 7(c)(1). (Doc. 138 at 2-3.)

*a. Definition of "protection order"*

First, Gaviola challenges the government's use of inconsistent terms to describe a "protection order," an essential element of the charges in this case. (*Id.* at 3, citing government's use of terms "domestic violence restraining order," "temporary restraining order," "restraining order," and "active restraining order".)

The indictment alleges that MV filed a "Request for Domestic Violence Restraining Order" against Gaviola on July 13, 2021. (*See* Indictment, Doc. 1 at 1-2 ¶ 3.) The Request was made by completing and filing a "DV-100" form with the Fresno County Superior Court. (*See* Doc. 144-2.) On July 14, 2021, a Fresno County Superior Court judge granted MV's Request and issued a "Temporary Restraining Order" using a "DV-110" form. (Doc. 135-1.) The order set a

hearing date for August 23, 2021, which also served as the initial expiration date of the temporary

restraining order. (*Id.*)[7]

The government's explanation in response is helpful:

> Under Section 6320, a court "may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking . . . destroying personal property, contacting, either directly or indirectly, . . . coming within a specified distance of, or disturbing the peace of the other party. . ." Cal. Fam. Code § 6320. Section 6320 "aims to prevent domestic violence" and "authorizes a court to enjoin abusive acts, upon a showing of a past act of abuse." *Alanis-Alvarado*, 558 F.3d at 838. Protective orders issued under Section 6320 are temporary in nature to stop the prospect of imminent abuse. Indeed, a court must decide to grant or deny a party's application within one court day. Cal. Fam. Code § 6326. California courts sometimes refer to a Section 6320 order as a "Domestic Violence Temporary Restraining Order" or "Temporary Restraining Order." *In re Marriage of A.M. & R.Y.*, 110 Cal. App. 5th 1115, 1125 (2025). They typically use California court form DV-110 to issue the order. *See In re Marriage of Nadkarni*, 173 Cal. App. 4th 1483, 1491 (2009).

(Doc. 144 at 17.) Thus, it appears that whether MV's protection order is referred to as a

"temporary" restraining order rather than a "domestic violence" restraining order, or vice versa,

this has no impact on these proceedings. Rather, this appears to be a frivolous challenge,

considering that Gaviola does not claim to be unaware of which protection order is at issue in this

case. Indeed, she was personally served with a copy of MV's Request and the TRO (Doc. 135-3),

she was present at the hearings, and she filed a formal response (form DV-120) to MV's Request.

(Doc. 144-3.)

To the extent Gaviola is arguing that the TRO does not constitute a "protection order" as

stated in § 2262, she is mistaken. For purposes of 18 U.S.C. § 2262, the term "protection order,"

for purposes of includes—

> **(A)** any injunction, restraining order, or any other order issued by a

---

[7] Due to MV's absence, Gaviola requested that the hearing be continued. (*See* Doc. 135-4 at 2.) The court granted her request and continued the hearing to October 4, 2021; as a result, the TRO was also extended. (*Id.* at 1-2.) Specifically, the Order on Request to Continue Hearing (Temporary Restraining Order) (form DV-116) from the August 23, 2021 hearing stated:

> **A Temporary Restraining Order (TRO) is in full force and effect** because:
> The court extends the TRO previously granted on *(date)*: <u>07-14-2021</u>
> It now expires on *(date)*: <u>10-04-2021</u>

(*Id.* at 1.)

civil or criminal court for the purpose of preventing violent or threatening acts or harassment against, sexual violence, or contact or communication with or physical proximity to, another person, including any temporary or final order issued by a civil or criminal court whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil or criminal order was issued in response to a complaint, petition, or motion filed by or on behalf of a person seeking protection; and

**(B)** any support, child custody or visitation provisions, orders, remedies or relief issued as part of a protection order, restraining order, or injunction pursuant to State, tribal, territorial, or local law authorizing the issuance of protection orders, restraining orders, or injunctions for the protection of victims of domestic violence, sexual assault, dating violence, or stalking.

18 U.S.C. § 2266(5).

The government has indicated that it intends to prove that the temporary restraining order, issued on July 14, 2021, meets the legal definition under § 2266. (Doc. 144 at 27.) Gaviola does not offer any meaningful argument to support a finding that the TRO is not, for example, "any … restraining order … issued by a civil or criminal court for the purpose of preventing … contact or communication with … another person, ***including any temporary or final order*** …."  18 U.S.C. § 2266(5)(A) (emphasis added). To this end, the Court likewise finds no merit to Gaviola's argument that there is "simply no way of discerning the expiration of the temporary restraining order. In other words, the temporary restraining order never did become permanent, at least during the time frames alleged in the Indictment." (Doc. 138 at 3.)

*b.*    *Double jeopardy*

Finally, Gaviola's claims that the indictment's lack of specificity fails to ensure Defendant's right against future prosecution for the same offense under the Double Jeopardy Clause of the Fifth Amendment. (Doc. 138 at 4.) However, because the Court finds that the indictment is sufficiently specific, as discussed above, this argument is moot.

///

## III.    Conclusion and Order

Gaviola has failed to demonstrate that the indictment should be dismissed, or that paragraphs 2, 4, or 6 of the indictment should be stricken. Thus, the Court **ORDERS**:

1.    Defendant Gaviola's motion to strike (Doc. 136) is **DENIED**.

2.    Defendant Gaviola's motions to dismiss (Docs. 137, 138) are **DENIED**.

IT IS SO ORDERED.

Dated:   **September 25, 2025**

UNITED STATES DISTRICT JUDGE

20