**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHANA GAVIOLA and JULIO SANDOVAL,<br><br>Defendants. | Case No.: 1:22-cr-00233 JLT SKO<br><br>ORDER DENYING DEFENDANT GAVIOLA'S MOTION TO DISMISS AND TRANSFERRING THE MATTER TO THE NORTHERN DISTRICT OF CALIFORNIA<br><br>(Doc. 177) |

The indictment in this case charges Shana Gaviola and Julio Sandoval with interstate violation of a protection order, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2262(a)(2) and 2. (Doc. 1.) Gaviola now moves to dismiss the indictment based on alleged prosecutorial misconduct, discovery violations, and denial of due process. (Doc. 177.) The government filed its opposition on October 6, 2025 (Doc. 180), and the Court held a hearing on the motion on October 7, 2025. For the reasons discussed on the record and set forth below, the motion is **DENIED**, but the matter is transferred to the Northern District of California for all further proceedings.

**I.     Relevant Background**

In July 2021, Shana Gaviola's son, Blake McGee[1], petitioned the Fresno County Superior

---

[1] Mr. McGee is now an adult but was 16 years old at the time.

1   Court for a temporary restraining order prohibiting Gaviola from, among other things, contacting
2   him. (Doc. 144-2.) The court issued the order on July 14, 2021. (Doc. 135-1.) Though McGee and
3   Gaviola both resided in Fresno County, California at the time the Superior Court issued the
4   restraining order, they did not reside together.[2] (Indictment, Doc. 1 at 1-2.) Along with the
5   petition for a restraining order, McGee also filed a petition to become an emancipated minor. (*Id*.
6   at 2.)

7         On August 18, 2021, Ms. Gaviola appeared in court at the hearing on McGee's petition
8   for emancipation. (Doc. 150-2 at 3) The Court granted Ms. Gaviola's request to continue the
9   hearing to allow her to retain counsel. *Id*. At the hearing, the bailiff served Gaviola a copy of the
10  restraining order and a copy of the emancipation petition. *Id*. The government alleges that soon
11  thereafter, Gaviola arranged with Sandoval to have McGee transferred to a religious boarding
12  school in Stockton, Missouri, where Sandoval was the Dean of Students. (Doc. 1 at 2.) Sandoval
13  was headed up a company that transported minors to various boarding schools across the country.
14  (*Id*.) The government alleges that Gaviola and Sandoval agreed to send agents of the
15  transportation company to take McGee into their custody and transport him from California to
16  Missouri. (*Id*.)

17        The government alleges that on August 21, 2021, at the behest of the defendants, the two
18  agents went to McGee's workplace. (Doc. 1 at 3.) They restrained McGee in handcuffs, required
19  him to enter their vehicle, seized his iPhone 8, and drove him for approximately 27 consecutive
20  hours to the boarding school in Missouri. (*Id*.) McGee remained restrained for the duration of the
21  drive. (*Id*.) During the drive, law enforcement officers contacted Sandoval by phone and advised
22  him that McGee had an active restraining order against Gaviola. (*Id*.) Upon arrival in Missouri on
23  August 22, 2021, the agents delivered McGee to the boarding school. (*Id*.) The government
24  alleges that school staff members detained McGee within the facility despite requests by his
25  father to release him into his custody. (*Id*.) After approximately eight days of detention, McGee
26  was released to the father's custody. (*Id*.)
27  ///
28
---
[2] McGee lived with another family in the area and had done so for about two years.

## II. The Motion to Dismiss

In her current motion to dismiss, Ms. Gaviola asserts that the indictment should be dismissed due to discovery violations and prosecutorial misconduct based upon an incident occurring on May 25, 2023. On that occasion[3], members of the United States Attorney's Office were engaged in a going-away party for an AUSA who was leaving the office. Michael Tierney, the AUSA assigned to this matter, and four others left that party after having drunk one or two beers, and travelled to another local bar, the Modernist.

Tierney testified that when they arrived, he saw a woman looking at him and smiling. Thinking she may be the mother of a friend or teammate of one of his children, he went over to her. He asked the woman something along the lines of "Do we know each other?" and she said her name. This reminded Tierney that he was speaking to the defendant in this case. Tierney testified that Gaviola began asking him questions, and he felt compelled by social pressure to be polite and respond. Tierney told her that they could not talk about the case but could have a conversation as along as it had nothing to do with the case. They talked about the fact that they had lived in the same neighborhood at some point and where their children went to school.

Ms. Gaviola testified a bit differently. She testified that she went to the Modernist with her boyfriend after work. Before Tierney arrived at the bar, she had drunk a "lavender drink," implying it was an alcoholic beverage. When Tierney and his group entered the bar, they were loud and laughing, which she believed indicated they had been drinking heavily. She thought she recognized Tierney, but wasn't certain it was him. Tierney looked at her with a flirty smile and came over to her table. He shook her hand, and she asked whether he recognized her. He said he didn't, and she then told him her name. After hearing her name, he appeared to have recognized who she was.

During the contact, Gaviola believed that Tierney was "hitting" on her, which made her uncomfortable. Tierney said they could talk about anything but the case. Even still, Gaviola asked him whether he often defends people who kidnap other people's kids.[4] Tierney responded that the

---

[3] The following recitation comes from an evidentiary hearing conducted on October 7, 2025.
[4] The Court is aware that Gaviola contends that the family with whom McGee was residing in 2021, solicited and pressured McGee to seek the restraining order and file the emancipation petition, and that in

3

1  prosecution was not personal, that it was his job. Tierney said something along the lines of "if he
2  won the trial, he would seek the least amount of jail time" for Gaviola. Gaviola testified that she
3  and Tierney did not otherwise talk about the case. Gaviola testified that Tierney suggested that
4  after the trial, that "maybe we can go get a drink" or she could "take [Tierney] for a drink."

5  Tierney testified that he left Gaviola's table and walked to the back of the bar to an alcove
6  near the restrooms. There, he called FBI Special Agent Alexia Crow, who was the case agent. As
7  he began speaking with SA Crow, Gaviola appeared in the area. Tierney told Gaviola he was
8  speaking to the FBI Agent and handed the phone to Gaviola. Gaviola took the phone and asked
9  something like whether this was the "hot FBI agent."

10 Special Agent Crow testified that she received the call from Tierney while she was at her
11 home. Tierney said something like, "You'll never guess who I ran into." Immediately afterward, a
12 woman's voice, that she did not recognize, was on the phone. While Crow was trying to place the
13 voice, the woman said that it was Shana Gaviola. Gaviola then made pleasantries. Crow
14 responded, "I don't know what to say. I'm speechless." Next, Gaviola shared that when Crow
15 came to her house to execute the search warrant on Gaviola's phone, she later explained this
16 situation to her boyfriend as one in which a "hot FBI agent had come to her house and that [the
17 FBI agent] was a solid 9 out of 10."

18 Crow testified that she and other FBI agents went to Gaviola's house during the
19 investigation to execute the search warrant on Gaviola's phone. The team was made up of male
20 and female agents, not all female agents or even predominantly female agents. The call with
21 Gaviola ended after Gaviola made the "hot FBI agent" comment that with no other statements
22 being made by either Gaviola or Crow. Crow testified that she did not write a report about the
23 contact with because agents write such reports only when they learn something that is substantive
24 and material to the case in some way, "And the statements that [Gaviola] made to me were not."

25 Gaviola testified to a different version of these events. She said that about 15-20 minutes
26 after Tierney departed from the area of her table, she went to the bathroom. Tierney was not near
27 the restrooms. When she exited, however, Tierney was standing just outside the bathroom talking

28 making this comment, Gaviola was referring to the mother of that family.

4

on his phone and was positioned in a way that he was looking right at Gaviola as she exited the ladies' room. Tierney then said something like, "yeah, she just walked out," and "you don't believe me," and then he handed his phone to Gaviola and said that it was Agent Crow on the line. Gaviola took the phone, and she heard Crow say something like "this is crazy . . . I don't know what to say." Then, Gaviola started sharing a story with Crow about how she told her friends about the execution of the search warrant at her home when "five hot FBI agents swarmed my car," and how it was weird to see female FBI agents "swarming my car." Gaviola then said something like, "You think I'm the worst person in the world." Agent Crow responded with something like, "I'm glad you're out having a good time" or "I'm glad you are able to enjoy your life and have a good time." Gaviola testified that Agent Crow did not ask her any questions or say anything about the investigation or the prosecution, but that Crow was being condescending. Gaviola said that this interaction with Tierney was "really weird. It was very uncomfortable. It was very flirty, and he was flirting with [the FBI Agent] and he was flirting towards me. Just mannerisms and the way that he was kind of looking . . ."

After the call ended, Tierney testified that he left the bar and went outside to call Anthony Capozzi, Gaviola's then-attorney. He wanted to tell Capozzi about the encounter with Gaviola. He explained the situation and Capozzi indicated that he didn't feel that it was a problem. Tierney testified, "I was gladdened to hear Mr. Capozzi's thoughts that it wasn't a problem because he's such an experienced attorney. He was on the Board of Governors for the State Bar. I very highly respect his opinion. So, I wasn't comfortable with things . . . I didn't, you know, brush it off." While talking with Capozzi, Gaviola exited the bar with her boyfriend. As they did, Tierney saw her and handed his phone to Gaviola for her to speak to Capozzi. Tierney stepped away to give her privacy to speak with Capozzi.

Mr. Capozzi testified that Tierney explained to him that he had encountered Gaviola in the bar. Tierney explained that initially he didn't know who she was but then realized when Gaviola said something about Tierney trying to put her in jail for the last year. Tierney told Capozzi that he thought that Gaviola was violating the terms of her pretrial release, in that he believed she was on an ankle monitor, which required her to be home at that time of night. Capozzi told Tierney

5

1  that the ankle monitor had been removed, and the curfew condition had been lifted a few months
2  before.

3   Capozzi said that Tierney gave the phone to Gaviola. When he spoke to Gaviola, he
4  developed no concern about the contact with Tierney and told her something along those lines.
5  The call ended and he had no further contact with Tierney or Gaviola that evening. However, he
6  met with Gaviola the next day during which Gaviola told Capozzi that she felt like Tierney was
7  hitting on her and wanted him removed from the prosecution. She reported that Tierney
8  mentioned that they had lived in the same neighborhood and that their children had gone to the
9  same school and that Tierney had told her that they could talk but could not talk about the case.
10  Gaviola said that Tierney said something about seeking only the minimum jail time if she were to
11  be convicted. Gaviola told him nothing that made him believe that any attorney-client
12  communications had been disclosed or that they had talked about the case.

13   Capozzi didn't feel like the encounter warranted him taking any action. He did not report
14  the encounter to the Court, nor did he ever tell Gaviola that had done so. He testified that from his
15  understanding of the events, "nothing happened," so he would not take the action that the defense
16  counsel was currently taking. He said that when Gaviola asked him to file a motion to have
17  Tierney removed from the case, he refused and said that he would withdraw from the
18  representation rather than do that, because he did not find that there were legal grounds for the
19  filing.

20   Gaviola's testimony was different. She testified that about 15 or 20 minutes after the
21  interaction with Tierney outside the bathroom, she and her boyfriend left the bar and began
22  walking to where they would meet their Uber driver. She heard her first name called, and she
23  turned around and saw Tierney exiting the bar behind her. He handed her his phone and said that
24  Capozzi was on the line. Capozzi said that this was a "weird situation" and asked whether she
25  was on the prosecutor's phone and then, "how are the drinks there?" in reference to the bar.
26  Gaviola said that she expressed her discomfort about the situation to Capozzi many times, but she
27  never asked him to file a motion to have Tierney removed from the case. Capozzi told her that he
28  "wrote a statement, that the judge was aware this happened, that everybody was aware, and that

6

nothing needed to be done." Capozzi told her that they wanted Tierney on the case because he would ask for the least amount of jail time in the event of a conviction and that they didn't want Tierney removed from the case. Despite this, she spoke with Capozzi more than once about her discomfort over the situation.

Tierney testified that after speaking with Capozzi and allowing Gaviola to do the same, he went back in the bar and joined his friends. During this time, he began exchanging texts with Agent Crow. In these texts, which the Court received into evidence, both Tierney and Agent Crow expressed shock about what had happened. Tierney texted, "Holy shit, I am shellshocked, I am not dealing with this." Crow responded, "I am sitting in bed wide eyed and in shock. I can't stop replaying that entire craziness." Tierney responded, "Me neither, I am moving from shock to PTSD." Tierney confirmed with Crow, "We are agreed to never tell Blake about this, right?" and Crow responded, "100%." Tierney explained that everyone in the bar—about 40 people— witnessed the exchange with Gaviola and that his friends who were with him in the bar, "were useless because [the departing AUSA] told them that I always wingman for people and they thought I was doing that for someone with Shana." He explained that as a result, "They left me alone and went into the back [of the bar]." He texted, "This may be too soon to make jokes but honestly she looked kind of good tonight. I can see why they thought that." Crow responded, "Not you too!! She wins everyone over." Tierney responded, "I mean I'm still going to prosecute her, I can hold two ideas in my head at once. And she's into girls[5] and likes you. This whole get together after she gets out of prison is starting to really sound interesting." Crow responded with a image which read, "I QUIT." Tierney texted, "Yeah ok fair but I am trying to process some shit here and humor is what I'm relying on. And alcohol. Lots of alcohol." Crow responded, "I sincerely wish I was there to commiserate in person. And drown all these whirling thoughts with alcohol." Tierney's final text reads, "You owe me on those fronts and I will cash in. Please warn [her husband] at some point as I will [his wife] because that will take a minute." Crow responded,

---

[5] Tierney testified that when Gaviola was interviewed during the investigation of the underlying events, Gaviola indicated that she would not have taken her minor child against his will to a religious boarding school based upon any claims that she had a hostility to homosexuality, because she considered herself to be bi-sexual.

7

1  "Ha. Deal."

2     Gaviola testified that she felt that "everybody was notified and nobody cared that I was
3  uncomfortable, that I didn't feel safe in [the courtroom], that every time I came in, Tierney was
4  smiling at me and flirting with me." She recounted that after the last hearing, Tierney stopped her
5  to confirm how she pronounced her first name. She said, "It's an awful feeling, and it make me
6  feel like I'm just by myself and everybody knows, like everybody's ok with keeping secrets." She
7  continued, "My concern is that they all got together and decided let's not report this." She said,
8  "Like that's concerning to me that this is the FBI agent in charge of my case and the prosecutor in
9  charge of my case and they and, and my own attorney, and they all got together, and they chose
10 it's best that we don't say anything to Blake to the court to anywhere at all. And that's the kind of
11 morals that we're dealing with. It's concerning." Even still, Gaviola testified that neither Tierney
12 nor Agent Crow talked to her about the case or asked her any question about it.

13    Tierney testified that he spoke to Gaviola's current counsel on September 28, 2025, in
14 part, about the encounter with Ms. Gaviola in May 2023. This was the first time he and current
15 counsel had spoken of the events of that evening. Tierney said that he would remove himself from
16 the case but admitted that though he had removed himself as attorney of record, and he was
17 making no more appearances in court on the case, he had been assisting with witness interviews.
18 Tierney reported also that during the conversation, counsel also indicated he intended to seek
19 recusal of the undersigned due to the Court's past involvement in an unrelated case[6], and because
20 the undersigned may have been part of the decision to select Tierney as a Magistrate Judge.[7]

21    In her motion now before the Court, Gaviola asserts that the government's "egregious
22 prosecutorial misconduct" violated her Fifth Amendment due process rights, Sixth Amendment
23 right to counsel, and the government's discovery obligations under *Brady*, *Giglio*, and Rule 16.
24 She further contends that the concealment of the discovery about these events reflects willful
25 misconduct warranting dismissal under the Court's supervisory powers.

---

[6] Counsel made this motion on September 29, 2025 (Doc. 168), and the Court denied it (Doc. 175).
[7] In August 2025, the Chief of the Court announced that Mr. Tierney had been identified as the presumptive replacement for a retiring Magistrate Judge of the Court, pending background investigation and evaluation.

## II. Legal Standard

Dismissal of an indictment for prosecutorial misconduct is an extraordinary remedy, reserved for only the most egregious cases. *United States v. Rogers*, 751 F.2d 1074, 1076-77 (9th Cir. 1985). It may be warranted under two distinct frameworks: (1) the Fifth Amendment's Due Process Clause, which requires outrageous government conduct, *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991); and (2) the district court's inherent supervisory powers, which may be invoked to remedy constitutional or statutory violations, protect judicial integrity, or to deter future illegal conduct. *Id.*; *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008).

### A. Discovery violations

Gaviola contends that the failure to disclose that Tierney had the interaction with Gaviola in May 2023 requires dismissal of the action. The Court disagrees.

Though there were inconsistencies in the testimony given at the evidentiary hearing, there was no dispute that there were no reports or notes generated that would require production of discovery. More telling, while the incident was in progress, Tierney telephoned Mr Capozzi and explained to him what had occurred.[8] The fact that current counsel did not know about this exchange before the eve of trial does not mean that the government failed in its discovery obligations. Indeed, even Ms. Gaviola knew about it—it involved her—and, apparently, she gave a "lengthy interview" to an "online periodical" in which she discussed the events of May 25, 2023 (Doc. 177 at 2-3).[9] The suggestion that these "undisclosed communications [were] only recently discovered" and that the government "concealed" the contact for two years is baseless. Similarly, the argument that the government had the obligation to prepare reports and then to produce them to the defense is flatly contrary to law.

Even still, Gaviola takes the position that the failure to produce "discovery" on this topic

---

[8] This satisfied the requirement of Fed.R.Crim.P. 16(a)(1)(A) to provide any oral statements by the defendant, though here, the government has explained that it has no intention of introducing any statements Gaviola may have made on May 25, 2023 at trial. Indeed, the Court can see no relevance of any of her statements. Thus, Rule 16 did not require any disclosure, though one occurred to Mr. Capozzi.

[9] This interview was not submitted to the Court.

9

violates *Brady*[10]. Once again, there is no evidence that the government had any discovery to produce.[11] The only evidence that reports were generated comes from Gaviola who testified—contrary to Capozzi—that Capozzi told her that he, the FBI agent and Tierney all wrote statements about what happened. Assuming these reports were written, by implication, Capozzi had seen the reports, such that he could say that they existed.

Also, the events described at the evidentiary hearing when taken most favorably to Gaviola, fail to demonstrate any manner of *Brady* violation. *Brady* requires the government to disclose evidence favorable to the accused that is material either to guilt or punishment. *Brady,* at 87-88. Despite repeated questioning at the evidentiary hearing, Gaviola's counsel failed to explain how *Brady* is implicated here. The motion nor argument of counsel demonstrated that the discovery—if it existed—would bear on any element of the charged crime or on any defense Gaviola intends on offering. Though she argues that all prosecutorial misconduct constitutes *Brady* material, she cites no authority to support this proposition.

Gaviola also contends that *Giglio v. United States*, 405 U.S. 150 (1972), required disclosure of discovery related to the May 25, 2023 incident. Again, there is no evidence that any discovery existed about the incident until the filing of the motion, and the government has produced the recently created notes and the texts exchanged between Tierney and Crow. Moreover, there is no showing that the events of May 25, 2023, could bear on the credibility of any government witnesses. Assuming *Giglio* would apply, the government would have an obligation to produce *Giglio* materials only after the witness testifies. *United States v. Rinn,* 586 F.2d 113, 119 (9th Cir. 1978). Thus, there is no showing that *Giglio* would require the relief sought by Gaviola.

Unlike in *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 1073) involving deliberate concealment of thousands of pages of discovery or *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) involving affirmative misrepresentation to the court—cases cited by the defense—

---

[10] *Brady v. Maryland*, 373 U.S. 83 (1963).

[11] By the time of the evidentiary hearing, the government had produced the text messages exchanged between Tierney and Agent Crow. The government also produced notes that, apparently, Tierney made sometime since September 28, 2025, about his recollection of the incident on May 23, 2025, though these notes were not entered into evidence.

10

1  there is no evidence of deliberate deception by the government or any showing that any act taken
2  in discovery has prejudiced the defendant in any way. Given the evidentiary showing made and
3  the arguments given by counsel, the Court finds that there has not been a sufficient showing of
4  any discovery failure by the government. Consequently, the motion is **DENIED** on this basis.

### B. Constitutional Violations

The Fifth Amendment's Due Process Clause requires dismissal of the action when prosecutorial misconduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." *Barrera-Moreno*, 951 F.2d at 1092 (quoting *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991)). However, absent "actual and substantial prejudice" dismissal is not an appropriate remedy. *United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008).

Accepting Gaviola's account of the events as true, it is noteworthy that she does not claim that either Tierney or Crow asked her questions or made any statements about the case or anything to do with the facts of it. "The privilege against self-incrimination protects an individual from being forced to provide information that might establish a direct link in a chain of evidence leading to his conviction." *Stringer*, at 938. There is no suggestion that this occurred here.

Gaviola described feeling shocked and very uncomfortable about the interaction with Tierney and that she felt that no one cared about the incident or cared that she felt unsafe as a result. The Court states here in as plain of terms as possible: none of what happened on May 23, 2025 is ok. The Court *does* care that this happened, it *does* care that she was made to feel marginalized, and it *does* care that she feels unsafe as a result. A defendant has enough stress, uncertainty and worry related to a criminal prosecution without also having to feel that she has no voice in the process or that she cannot be safe in the courthouse.

Despite the Court's significant concerns that the incident occurred at all, Gaviola's counsel has cited to no authority for the proposition these concerns rise to the level of a constitutional violation. What is needed instead is evidence suggesting that Gaviola has suffered or will suffer actual prejudice or that her trial will be unfairly impacted—or negatively impacted in any way—by the events of May 23, 2025. Rather, Gaviola's counsel argued only that Gaviola feels "that she cannot get a fair trial, certainly not in this district, certainly not with this US

1 Attorney's Office and certainly not with this FBI field office. . . The only remedy lesser than
2 dismissal . . . I would see as transfer of venue." This showing is insufficient.

3 On the other hand, Gaviola asserts that her Sixth Amendment rights were violated by
4 Tierney having contact with her despite her represented status. When the government has *ex parte*
5 contact that is intentional, undertaken in bad faith, or results in an unfair advantage to the
6 prosecution that cannot be cured by suppression, recusal, or other lesser remedies, dismissal may
7 be an appropriate exercise of the court's supervisory powers. *Rogers*, 751 F.2d at 1076-77;
8 *Chapman*, 524 F.3d at 1085; *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). Though
9 the Court has no hesitation in saying that the contact should not have occurred, Gaviola's motion
10 admits that the Sixth Amendment right is not violated unless the government *deliberately elicits*
11 statements from a defendant outside the presence of counsel. (Doc. 177 at 4-5, citing *Massiah v.*
12 *United States*, 377 U.S. 201, 203 (1964), *Maine v. Moulton*, 474 U.S. 159, 169-170 (1985);
13 *United States v. Henry*, 447 U.S. 264, 269-273 (1980). There is simply no evidence that this
14 occurred here, but even if it did, the law does not condone dismissal of the action.

15 In *United States v. Morrison*, 449 U.S. 361 at 362-363, federal agents repeatedly met with
16 a represented criminal defendant to attempt to get her to cooperate in an unrelated investigation.
17 The investigators disparaged her counsel, encouraged her to obtain replacement counsel,
18 discussed the various benefits she would receive if she cooperated and threatened a stiff jail term
19 if she did not. *Id*. at 362. Despite this, the defendant did not agree to cooperate, did not
20 incriminate herself and did not seek alternate representation. *Id*. Later, the defendant filed a
21 motion to dismiss the case but the "motion contained no allegation that the claimed violation had
22 prejudiced the quality or effectiveness of respondent's legal representation; nor did it assert that
23 the behavior of the agents had induced her to plead guilty, had resulted in the prosecution having
24 a stronger case against her, or had any other adverse impact on her legal position. The motion was
25 based solely upon the egregious behavior of the agents, which was described as having
26 "interfered" in some unspecified way with respondent's right to counsel. This interference,
27 unaccompanied by any allegation of adverse effect, was urged as a sufficient basis for the
28 requested disposition." *Id*. at 363. The trial court refused to dismiss the action, but after a

1 conditional plea to one of the charges, the Court of Appeals reversed. *Id*. While recognizing the
2 "fundamental importance of the right to counsel in criminal cases," the United States Supreme
3 Court held,

> Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.

*Id*. at 365. The Court continued, "More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate. [Fn] This has been the result reached where a Fifth Amendment violation has occurred, [Fn] and we have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment. The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression." *Id*.

Based upon *Morrison*, the Court is precluded from granting dismissal in this action even if it found that Gaviola's Fifth or Sixth Amendment rights were violated because she has failed to demonstrate *Morrison*-level prejudice.

### C. Supervisory Authority

If the government's investigatory or prosecutorial conduct is "reprehensible," but does not violate due process, a court may dismiss under its supervisory powers if the misconduct was "flagrant," it caused "substantial prejudice" to the defendant, and it cannot be cured by lesser sanctions. *Chapman*, 524 F.3d at 1085, 1087. Such "flagrant misbehavior" includes the government's reckless disregard for its constitutional obligations, whereas "accidental or merely negligent" conduct is insufficient. *Id*. at 1085.

The Court does not condone what occurred on May 25, 2023. For whatever reason, Mr. Tierney lost his way and again and again during the evening of May 25, 2023, compounded his error until his behavior became nearly incomprehensible. Then, when this was called to his attention, he withdrew from representing the government in court, but he continued to be

1   involved in the case behind the scenes.  This conduct would be troubling if committed by any
2   Assistant United States Attorney, but because Mr. Tierney was recently identified by the Chief
3   Judge of this Court as the presumptive replacement for a retiring magistrate judge, the conduct
4   strikes the very core of this Court's integrity. It forces this Court to make a Hobson's choice:
5   either it follows the law—as it must—and denies the motion to dismiss and in doing so convinces
6   the defendant (and maybe not only her) that she will not receive ultimate fairness in this Court, or
7   it grants the motion and disregards the law, and, in doing so, rejects everything for which the
8   Court stands. Thus, though the Court is disheartened, discouraged and demoralized by the events
9   at issue, it sees no alternative than to order that the motion to dismiss is **DENIED**.

10  The Court has no doubt that Ms. Gaviola could and would receive a fair and just trial in
11  this district before the undersigned or before any of the hardworking judges of this District whose
12  reputations, work ethics and commitments to justice are beyond reproach. However, no matter
13  how reverently fairness and justice are administered here, this case has suffered an indignity that
14  cannot be repaired in this District. Attempting to do so risks the very foundation on which our
15  Court and our justice system is based.

16  Courts have held that suppression, disqualification, or admonishment may be adequate
17  remedies where actual prejudice is absent. *See Morrison*, 449 U.S. at 365-66; *United States v.*
18  *Medina-Medina*, 617 F. Supp. 1163, 1172 (S.D. Cal. 1985). To avoid any further impropriety or
19  the appearance of impropriety in this action, the Court will order this case transferred to the
20  Northern District of California for all purposes. The Northern District of California is close
21  geographically to where most of the witnesses and Ms. Gaviola[12] are located and where the
22  prosecution and trial there would impose the least inconvenience.

### **ORDER**

Based upon the foregoing, the Court **ORDERS**:

1. Defendant Gaviola's motion to dismiss (Doc. 177) is **DENIED**.
2. The case is **TRANSFERRED** forthwith to the Northern District of California for

---

[12] Mr. Sandoval must travel from Missouri, so his travel to the Northern District of California is likely eased by the transfer.

1  all further proceedings.

2  3. The Clerk of Court is directed to electronically transfer this case to the Northern
3  District of California.

IT IS SO ORDERED.

Dated: __October 8, 2025__

UNITED STATES DISTRICT JUDGE